COMMONWEALTH *vs.* BERTRAM G. SPENCER.

Hampden.   May 23, 1912. — June 22, 1912.

Present: RUGG, C. J., MORTON, HAMMOND, BRALEY, & SHELDON, JJ.

*Homicide,* Insanity as a defence.  *Insane Person.  Superior Court.  Jury and Jurors. Practice, Criminal,* Commitment of defendant to hospital for insane for observation, Examination of jurors in capital case, Argument of counsel.  *Evidence,* Relevancy and materiality, Admissions and confessions, Opinion: experts, Absence of witness, Presumptions and burden of proof.  *Husband and Wife.*

St. 1909, c. 504, § 103, provides that if a defendant in a criminal case is, at or before the time appointed for trial, "found by the court to be insane or in such mental condition that his commitment to a hospital for the insane is necessary for" his "proper care or observation . . . pending the determination of his insanity, the court may commit him to a State hospital for the insane under such limitations as it may order," and that, if in the opinion of the trustees and superintendent of the hospital he is restored to sanity, he forthwith shall be restored to the jail from which he was removed, there to be held in accordance with the terms of the process by which he was originally committed.  *Held,* that the statute does not delegate solely to such trustees and superintendent the determination of the question, whether such defendant shall remain longer at the hospital.

Where under St. 1909, c. 504, § 103, a defendant who has pleaded not guilty to the charge of murder is committed to a State hospital for the insane for observation "until the further order of court," monthly reports to be made to the court by the hospital authorities, the court upon its own motion may order him returned to the jail from which he was transferred and determine for itself the question of his insanity upon the reports made by the hospital authorities or upon any other competent evidence.  Such action of the court would not be a violation of the Fourteenth Amendment to the Constitution of the United States.

After a defendant in an indictment for murder returned in Hampden County had been committed to a State hospital for the insane in Plymouth County under St. 1909, c. 504, § 103, for observation as to his sanity "until the further order of court" and had been under observation there for ten months, the Chief Justice of the Superior Court wrote a letter, which did not bear the seal of the court, to the sheriff of Hampden County directing him to "cause" the defendant "to be removed therefrom to the jail at Springfield" to be held there subject to the process by which he was committed to that jail originally, and the defendant was removed to Springfield accordingly.  Three months and a half later, on the day assigned for the trial of the case, the defendant moved that he be committed to the State hospital for the insane on the ground that he had not been returned therefrom legally.  In denying the motion on the ground that the court under

the statute had power to make the order remanding the defendant to jail, it also was *held,* that the informal character of the order in this case was immaterial.

The defendant in an indictment for murder, who relied upon a defense of insanity, asked the presiding judge before the empanelling of the jury to make specific inquiries of each proposed juror as to whether he believed in punishing crime if it was committed by an insane person, whether he believed that insane or degenerate persons should be put to death and whether he would acquit the defendant if he believed him to have been insane when he committed the crime. The judge refused the request of the defendant and asked each proposed juror the questions specified in R. L. c. 176, § 28, after having explained carefully to all of the panel the meaning of those questions. It did not appear that there was any reason to fear that any juror would ignore the defense of insanity and there was no evidence with reference to any of the proposed jurors. *Held,* that the matter of putting such questions was within the judge's discretion, and that he exercised his discretion wisely.

At the trial of an indictment for murder an eyewitness of the crime, who is testifying as to events immediately preceding it and has stated that she was at her home and was engaged with the deceased in solving a picture puzzle when the clock struck eight, may be allowed to state that when the clock struck the deceased made a remark, if there is further evidence that at that very time the defendant was in the house and that the murder was committed very shortly thereafter.

At the trial of an indictment for murder where the defense is insanity evidence is admissible which tends to show that, on the way to jail after his arrest the defendant said to the chief of police of the city where he lived, "Do with me what you wish. Send me to Siberia or wherever you see fit for life, but don't send me to the electric chair;" and that, after he had inquired of a member of the State police whether he had "got to go to the chair," and had been asked in return what he would want done with a man who had shot his mother or sister, he replied, "I would want them to go to the chair. Oh, my poor wife!" such evidence having a bearing on the question of the defendant's sanity and also being in the nature of a confession.

While the rule, that, upon the issue of sanity, a witness having no peculiar skill or personal experience can testify only to facts within his knowledge from which a condition of mind of a certain person may be inferred and is not permitted to state whether in his opinion, although that opinion is derived from personal observation, such person is or is not insane at a certain time, is relaxed when the witness is an attending or family physician, it is the duty of the trial judge to decide in the first instance upon the qualifications as an attending or family physician of a witness offered as such to give an opinion as to a person's sanity, and his decision upon that question is largely a matter of discretion and is conclusive unless from the evidence it appears erroneous in law.

At the trial of an indictment for murder where the defense is insanity and where much evidence has been introduced by the defendant bearing upon his physical condition from early boyhood, a physician, whose opinion, offered by the defendant on the question of his insanity, has been excluded on the ground that he was not a person peculiarly skilled on questions of insanity or an attending or family physician of the defendant, and who, it appears, had examined the defendant in his boyhood as a candidate for a school as to his physical condition at that time, may be asked in cross-examination whether or not in a certificate as

to such examination he had not answered in the negative the question, "Is the applicant suffering from any disease of the nervous system (chorea, epilepsy, etc.)," and to state that he had so answered and that the answer was true.

At the trial of an indictment for murder where the defense is insanity, persons who are neither physicians nor alienists should not be permitted to testify as to how certain actions of the defendant which they had observed compared with actions of insane persons whom they had seen.

Under R. L. c. 175, § 20, cl. 2, a wife cannot be compelled to testify in the trial of an indictment, complaint or other criminal proceeding against her husband, but the privilege of not testifying is hers and is to be asserted by her only, and if the defendant fails to call her to testify on a matter material to his defense of which she has knowledge, and does not explain his failure to do so, such failure is a proper subject for comment adverse to him in the closing argument for the Commonwealth.

Where at the trial of an indictment for murder the wife of the defendant might have testified as to certain material facts and the defendant did not call her as a witness and offered no explanation of his failure to do so, it is proper for the presiding judge to refuse to rule that "the wife of the defendant is privileged by law from testifying if she desires, and consequently no inference is to be drawn against the defendant because she did not testify, but chose to avail herself of that privilege," because it does not appear that the wife chose to avail herself of her privilege.

At the trial of an indictment for murder where the defendant contends and has introduced evidence tending to show that he was insane when he committed the murder, the jury, in determining whether the Commonwealth has sustained the burden of proving beyond a reasonable doubt that at that time the defendant was sane, should consider, with all the other evidence, the presumption of fact that he was sane at the time.

HAMMOND, J.   This was an indictment in two counts for the murder of Martha B. Blackstone on March 31, 1910, in Springfield in the County of Hampden.   The indictment was entered in court May 5, 1910, and on the sixteenth of the same month the defendant being arraigned pleaded not guilty.   Counsel were assigned to him and the nineteenth day of September then next was set as the time for trial.   The crime for which the defendant was indicted was committed in a dwelling house.   On the first floor of this house lived Mrs. Dow, an elderly lady, and her two daughters who were school teachers.   On the day of the homicide they had invited the deceased to spend the evening with them. She arrived late in the afternoon.   After the evening meal, while the four ladies were seated at a table in the parlor solving a picture puzzle, at about eight o'clock, P. M. the defendant who, as the evidence tended to show, had burglariously entered the house through a window, suddenly appeared at the doorway between

the dining room and the parlor. He wore over a part of his face a black handkerchief as a mask and was armed with a revolver, and he demanded money. He was first seen by one of the daughters, and, as she screamed, all the ladies arose and moved from the back parlor, where they had been sitting, toward the front parlor. The deceased screaming loudly was moving toward the front hall, when the defendant suddenly drew his revolver and shot her through the heart, killing her instantly. Great confusion followed, during which the defendant, after shooting but not mortally wounding one of the daughters, rushed through the front hall and out of the front door.

The defendant, on August 18, moved for a change of venue to the County of Worcester, "for the reason that an impartial trial . . . [could not] be had in the county in which the case . . . [was] . . . pending." This motion was overruled two days later.

On September 15, four months after the plea of not guilty and more than three weeks after the motion for a change of venue had been overruled, the counsel for the defense filed a motion setting forth that the defendant "is now insane, and in such mental condition that his commitment to a hospital for the insane is necessary for his proper care and observation pending the determination of his insanity," and praying therefore that he be committed to a state hospital for the insane "under such limitations as said court may order." After a hearing upon this motion during which there was evidence from "experts in insanity," the defendant was committed, on September 17, to a State hospital, upon conditions to be hereinafter stated. On July 25, 1911, more than ten months after his commitment, the Chief Justice of the Superior Court ordered that he be removed from the hospital to the jail at Springfield, "there to be held in custody in accordance with the terms of the process by which he was originally committed to said jail;" and on August 1 following, the defendant was so transferred. On September 18, 1911, the trial was set down for November 13, 1911.

1. On the day assigned, the defendant, before the jury were impaneled, filed a motion that he be committed to the State hospital for the insane upon the ground that he had not been "legally returned from the State hospital . . . [to] which he was heretofore committed by the order of the court." This motion was overruled and the defendant excepted.

The defendant was committed to the hospital under St. 1909, c. 504, § 103, which provides that if a defendant in a criminal case is, at or before the time appointed for trial, "found by the court to be insane or in such mental condition that his commitment to a hospital for the insane is necessary for the proper care or observation of such person pending the determination of his insanity, the court may commit him to a state hospital for the insane under such limitations as it may order." It also provides that if a person so removed is in the opinion of the trustees and superintendent of the hospital restored to sanity, he shall be forthwith restored to the jail from which he was removed, to be there held in accordance with the terms of the process by which he was originally committed.

The defendant contends that he could not lawfully be returned except upon a finding by the trustees that he was restored to sanity. It is to be noted that we are not dealing with a case where the grand jury has failed to return an indictment against an accused person solely on the ground of his insanity, nor where a trial jury has for the same reason acquitted a defendant, nor where the defendant for the same reason cannot plead to an indictment. The question before us in no way respects the mental condition of the defendant at the time when he committed the homicide, or was indicted, or entered his plea, nor does it concern the question of his guilt or innocence. It has reference simply to the disposition to be made of him after a general plea of not guilty, and before the trial upon the issues raised by that plea.

In the absence of any statute upon the subject it seems to have been the rule at common law that the prisoner at that stage of his career was held in jail, under the precept by which he was committed, until his trial, or until released by some order of the court. See Archb. Crim. Pr. & Pl. (24th Eng. ed.) 191–193, and cases there cited. And such seems to have been the practice in this Commonwealth before St. 1849, c. 68. This statute provided in substance that if at the time appointed for the trial the court before whom the trial was to be had was satisfied that the defendant was insane, it could authorize such person to be removed to an insane hospital for such term, and under such limitations, as it should direct. And with certain modifications not here material this statute was re-enacted in Gen. Sts. c. 172, § 14; Pub. Sts. c. 214, § 16; R. L. c. 219, § 12. Up to the year 1904, this power

to commit was limited to cases where the defendant was found by the court to be insane, but in that year it was extended to cases where the defendant is found by two experts in insanity, designated by the court, to be in such mental condition that his committal to an insane hospital is necessary for the proper observation of such person pending the determination of his sanity. St. 1904, c. 257. Then follows St. 1909, c. 504, § 103, the provisions of which have been hereinbefore recited.

Upon the hearing upon the original motion for committal to the hospital the defendant was not found to be insane, but only to be in such mental condition that his committal was necessary for his proper care and observation pending the determination of his insanity; he was committed simply for that purpose, and he was to be there confined until the further order of the court under the proper care and observation of the officers of the hospital who were to make monthly reports to the Chief Justice of the court. Ten months afterwards the Chief Justice ordered that he be returned to the jail at Springfield.

In view of the practice before the St. of 1849, c. 68, and the history of the legislation upon this subject, we are of opinion that St. 1909, c. 504, § 103, was not intended, at least in cases where the person indicted is committed not upon the ground that he is insane but simply for examination pending the determination of his insanity, to delegate solely to the trustees and superintendent the question whether he should longer remain in the hospital, but that where, as in this case, the person indicted has been committed pending the determination of his insanity until the further order of the court, the court upon its own motion can order him to be returned to the jail, and determine for itself the question of insanity upon the reports made by the officers or upon any other competent evidence. The purpose and legal effect of the statute is not to take away from the court the jurisdiction to determine finally the question of the sanity of the defendant, but to provide a place for his care and custody pending the determination of that question.

It appears that the order for the return to the jail was not made until after about ten months from the time of the committal of the defendant to the hospital; and it is to be presumed that the monthly reports of the mental condition of the defendant had

been sent to the Chief Justice in compliance with the order of committal. The record does not disclose the nature of these reports. Under these circumstances the defendant has no ground of complaint against the order for his return. The fact also that the order for the return is in the form of a letter * and not under the seal of the court is immaterial to the question before us. The defendant had pleaded not guilty to the indictment, he had not been adjudged insane, he properly could be ordered to trial, and he was in court and the court was not bound to go through the ceremony of sending him back to the insane hospital simply that he might be again returned to jail. And that was so even if the order of the Chief Justice was informally communicated to the officer or to the hospital authorities. Moreover the overruling of the defendant's motion was of itself in substance a sufficient order by the court for the appearance of the defendant. The motion was rightly overruled and the defendant, never having been adjudged insane, was thereupon properly before the court for trial.

Upon the record no federal question appears to have been raised at the hearing in the trial court; but even if, as contended by the defendant, he can now raise the question in this court, it is enough to say that in view of the true construction of the statute, and of the nature of the order of committal, which was until the further order of the court, there is no merit in the contention of the defendant that the order for return to this court was in violation of the Fourteenth Amendment to the Federal Constitution.

2. The exception to the overruling of the motion to quash has not been argued on the defendant's brief. There is nothing in it. The case was submitted to the jury only on the first count. Upon an examination of the record it is manifest that the motion was rightly overruled.

3. The next exception relates to the refusal of the trial judge

---

* This letter was addressed "To the Sheriff of Hampden," was signed by the Chief Justice, and read as follows: "You will forthwith cause Bertram G. Spencer, now under care and observation pending the determination of his insanity at the Bridgewater State Hospital, to be removed therefrom to the jail at Springfield, there to be held in custody in accordance with the terms of the process by which he was originally committed to said jail and this shall be your authority therefor."

to put certain specific questions to those summoned as jurors.*
In reply to the request the judge stated that he intended to in-
struct the jury that if the defendant was insane at the time of the
homicide he was legally irresponsible and it would be the duty of
the jury to acquit him; that he should assume that the jury would
follow the instruction, and that "if during the progress of the exam-
ination [of those called for service as jurors] it appeared that any
special question ought to be put to a particular juror, he would
feel it his duty to put it, and especially if it seemed that there was
any question about the juror being impartial." He then addressed
some remarks to those summoned as jurors, in which, in a pains-
taking and unexceptionable manner, he explained at some length
the meaning of the statutory questions which he should put to
them. Then, as each proposed juror was called, the judge put to
him the statutory questions.† , Of the six questions which the
defendant had asked to be put, the fourth and fifth were sub-
stantially covered by the statutory questions and need not be
further considered. The remaining four related to the defense of
insanity, and seemed to have proceeded upon the theory that the
jurors, or some of them, might entirely ignore that defense. It
does not appear that there was any reason to fear such a result or

---

* These questions were as follows:

"1. Do you believe in punishing crime if committed by an insane person?

"2. Do you believe that degenerates and insane criminals should be put
out of the way, that is, should be put to death?

"3. If you believed that at the time the prisoner committed the crime he
was insane within the meaning of the law as declared by the court, would you
be willing to acquit him on the ground of insanity?

"4. Do you entertain any feeling of hostility or resentment toward this
defendant because of anything you have read or heard in regard to him?

"5. Have you formed or expressed any opinion in regard to the sanity or
insanity of the defendant?

"6. Would you acquit the defendant if you believed that at the time of
the commission of the act he was dominated by an uncontrollable impulse?"

† The questions which the judge asked of each of those called to serve as
jurors were founded on R. L. c. 176, § 28, and were as follows:

"1. Are you related either to the prisoner at the bar or to the deceased?

"2. Have you any interest in the case, or have you formed or expressed
any opinion, or are you conscious of any bias or prejudice therein?

"3. Are your opinions such as to preclude you from convicting a defendant
of an offense punishable with death?"

that any competent evidence of any kind was introduced or offered with reference to the proposed jurors or any one of them.

Before the St. of 1887, c. 149, the examination of jurors as to interest, bias etc., beyond the inquiries expressly provided for by the statute, was left to the discretion of the presiding judge. *Commonwealth* v. *Gee*, 6 Cush. 174. *Commonwealth* v. *Burroughs*, 145 Mass. 242. As to the changes made by St. 1887, c. 149, now incorporated into R. L. c. 176, § 28, Holmes, J. in *Commonwealth* v. *Poisson*, 157 Mass. 510, 512, uses the following language: "It would be unfortunate if all control of such an examination should be taken from the court, and we do not interpret the St. of 1887, c. 149, as having that effect. On the contrary, the power given by the St. of 1887 to the parties to make the examination provided for by the Public Statutes is, in terms, to make it 'under the direction of the court.' There is still a discretion, and, in our opinion, it is exercised wisely by not going beyond the usual questions, unless something appears which makes it proper to go further." Under this law as thus laid down we are of opinion that the matter of putting the questions was within the discretion of the court, and that upon the record it was exercised rightly.

4. Miss Harriet Dow, one of the four ladies in the parlor at and before the time of the homicide, testified that they were in the parlor working "away at the puzzle," and that she remembered that the clock struck eight. She was allowed against the exception of the defendant to state that when the clock struck eight the deceased made a remark. The witness was not allowed to state what the remark was. For aught that appears it was of such a character as by association to impress vividly upon the mind of the witness the fact that the clock had struck eight and thus to fix the time. But whether that be so or not, there was evidence that at that very time the defendant was in the house engaged in his nefarious undertaking, and it is certainly not erroneous to show that as he was stealthily approaching his victim she was conscious and was engaging in conversation.

5. At the trial the main defense was insanity, and on that issue much evidence was introduced as to the character and conduct of the defendant ever since his early boyhood. The fifth and sixth exceptions are to the admission in evidence of certain statements

made by the defendant after his arrest.*   These statements were plainly admissible as tending to show his realization of the nature of the crime and thus having a bearing upon the question of his sanity, and also as in the nature of a confession that that crime had been committed by him.

6.   The exceptions to the exclusion of the witnesses Danielson and La Motte, as qualified to give their opinion on the question of the sanity of the defendant, are not tenable.   Whatever may be the practice elsewhere, it has long been settled in this State that, with the exception of the subscribing witnesses to a will, persons "having no peculiar skill or professional experience, can testify only to facts within their own knowledge, from which the condition of mind may be inferred, and are not permitted to state whether in their opinion, though derived from personal observation, a certain person was sane or insane at a particular time."   Gray, J. in *Hastings* v. *Rider*, 99 Mass. 622, 624.   As to attending or family physicians, the rule is somewhat relaxed.   It is the duty of such a physician to make himself acquainted with the peculiarities, bodily and mental, of his patient, and he has the experience resulting from the performance of such duty.   He therefore is permitted to testify from his own observation to the patient's mental capacity.   The law in this Commonwealth on this point is so well settled, and has been so many times applied, that it is unnecessary to discuss it here.   For a statement of the basis upon which it rests and for the manner in which it has been applied, see among other cases *Hastings* v. *Rider*, *ubi supra*, and cases therein cited.   *Clark* v. *Clark*, 168 Mass. 523, and cases cited.   *Commonwealth* v. *Rich*, 14 Gray, 335.   See also *Goodwin's trial*, (1885) page 295.

But such a physician comes under the rule as to experts, and

---

* The first of these statements was to John H. Boyle, captain of police of Springfield, who testified that while he was riding in the patrol wagon with the defendant on the way to jail the defendant said to him, "Do with me what you wish.   Send me to Siberia or wherever you see fit for life, but don't send me to the electric chair."   One Fred F. Flynn, a member of the district police, testified as to the other statement as follows: "Later on I talked to him and he said, 'Mr. Flynn, what is to become of me?   Have I got to go to the chair?' I said, 'Mr. Spencer, I don't know what the jury will do with you.   What would you want done with a man who would shoot your mother or sister when they had done no one no harm?'   He said, 'I would want them to go to the chair. Oh, my poor wife!'"

when he is offered as a witness it is the duty of the presiding judge to decide upon his qualifications as such physician in the first instance. And while there may be cases where his decision upon that question is plainly erroneous and for that reason must be reversed (*Muskeget Island Club* v. *Nantucket,* 185 Mass. 303), yet the matter is largely within the discretion of the judge and his decision, being one of fact, is conclusive unless upon the evidence it appears erroneous in law. *Perkins* v. *Stickney,* 132 Mass. 217. *Muskeget Island Club* v. *Nantucket, ubi supra. Lawrence* v. *Methuen,* 187 Mass. 592. In the present case considerable evidence as to the respective qualifications of the witnesses Danielson and La Motte was introduced. It is unnecessary to recite it in detail. It is sufficient to say that it cannot be said as matter of law that it did not warrant the conclusion reached by the court as to each of them.

7. Upon the cross-examination of Danielson it appeared that he had once examined the defendant as a candidate for admission to the Mount Hermon school as to his physical condition at that time; that certain interrogatories were upon a paper, and that the results were stated in written answers to these, all in the general form of a certificate signed by the witness. He testified without objection on the part of the defendant as to many of these answers and that they were true. Finally he was asked whether in answer to the interrogatory: "Is the applicant suffering from any disease of the nervous system (chorea, epilepsy, etc.)," he answered "No." Against the strenuous objection of the defendant he was allowed to say that he did so answer and further that the answer was true.

It is now contended in behalf of the defendant that this was an expression of opinion by the witness as to the sanity of the defendant, and that, since the court had rejected him as a witness for the defendant on that issue, the answer was inadmissible. But it clearly appears from the record that the evidence was not admitted upon the question of the mental condition of the defendant, but simply on his physical condition. The result of the two questions was to get from the witness his present idea of the physical condition of the defendant at the time the certificate was given. Much evidence was introduced by the defendant bearing upon his physical condition from his early boyhood, and to meet that, this was clearly admissible.

8. The questions put to the witnesses Bailey and Carpenter *
as to how the actions of the defendant compared with those of the
insane people which they had seen were properly excluded. The
only thing these witnesses could do was to describe the appearance
of the defendant so that the jury might see, so far as possible, what
they saw, but it is manifest that the jury could not be helped in
thus seeing by any comparison of such appearance with the con-
duct of persons whom, although insane, the jury never had seen.
It is unnecessary to name other obvious objections to the admis-
sibility of the evidence.

9. Dr. Briggs, an alienist called by the defendant, after having
testified that in his opinion the defendant was insane, stated on
cross-examination that he had made two examinations of him;
that during one of the examinations the defendant made several
statements; that among them was one to the effect that he "found
himself at the throat of his child twice and had been torn away by
his wife before he realized what he was doing; that he remembered
hearing the child scream and remembered nothing else until the
wife took him away from the child." The witness further stated
that he believed this statement to be true, and that he considered
it, and that it was one of the things that had an effect upon his
mind in reaching his conclusion. He also testified to other state-
ments made to him by the defendant. During the trial the defend-
ant's wife was sitting beside him and administering to his needs.
She was not called to the witness stand either by him or by the
Commonwealth.

During the closing argument for the prosecution, the Attorney
General, upon the question of insanity, alluding especially to the
opinion of Dr. Briggs, called attention to the fact that there was
no evidence that the defendant's statements concerning his attacks
upon his child, which the doctor had assumed to be true, were in
fact true. And in this connection the Attorney General said that
the person "who could tell . . . more about this defendant than
any [other] living person" was the defendant's wife. He com-
mented in a manner unfavorable to the defendant upon his failure
to call his wife as a witness not only to the matter of the attacks
upon the child, but to the general question of the defendant's

---

\* Neither of these witnesses was a physician or an alienist.

sanity so far as she could testify as to his acts bearing on that issue. The defendant did not call the attention of the court to those remarks at the time they were made nor object to this line of argument.

Before the charge to the jury the defendant asked the judge to rule that "the wife of the defendant is privileged by law from testifying if she desires, and consequently no inference is to be drawn against the defendant because she did not testify, but chose to avail herself of that privilege." The judge refused to give this instruction and the defendant excepted. During the charge the judge stated that the defendant had the right to testify but that if he declined to do so, that circumstance must not to any extent · whatever be taken against the defendant; but he gave no instructions with reference to the failure of the defendant to call his wife. At the close of the charge the defendant, while taking an exception to another portion of the charge, made no complaint of the omission in the charge of any instructions as to the wife's failure to testify, nor did he ask the judge to say anything on that subject. After the refusal of the judge to give the ruling the defendant in no way seems to have mentioned the subject again, but to have relied entirely upon his exception to the refusal to give the ruling as requested. The sole question therefore is whether there was error in the refusal.

At common law, with certain exceptions not here material, neither husband nor wife was a competent witness in any action or proceeding, civil or criminal, to which the other was a party. This rule has been quite generally modified in England and in the States of this Union. There is considerable difference in these various statutes, resulting in a diversity of practice. In this Commonwealth it was provided by St. 1870, c. 393, § 1, that any person of sufficient understanding might testify, providing, however, that "neither husband nor wife shall be compelled to be a witness on any trial upon an indictment, complaint, or other criminal proceeding, against the other." And such has been our law ever since. Pub. Sts. c. 169, § 18, cl. 2. R. L. c. 175, § 20, cl. 2. By the same statute it is provided that the defendant in a criminal proceeding may testify for himself, but his failure to testify shall not be taken against him. The result of our statutory provisions is that a party to a legal proceeding, either civil or criminal, may testify or may

call any person of sufficient understanding as a witness, except that neither husband nor wife shall be compelled to testify against the other in a criminal case, nor in any case shall be allowed to testify as to private conversations with each other. *Commonwealth* v. *Barker*, 185 Mass. 324. It is well to note the difference as to the various kinds of testimony with which the statute deals. As to private conversations with each other, neither husband nor wife is allowed to testify, no matter how much the testimony is desired by either of them or by any third party. As to their testimony against each other either may testify, but shall not be compelled so to do in a criminal proceeding against the other. The privilege is that of the spouse called and not of the defendant. In the case of the defendant in a criminal suit the question whether he will testify is decided by him alone. In only this last case is his failure to produce the evidence not to be taken against him. In all other proceedings and as to all witnesses except himself in a criminal proceeding against him, the defendant is left to the general principles of law as to what inference may be drawn against him for his failure to produce evidence in his favor. In this respect our statute differs from those of some States which expressly provide that the failure of one spouse to produce the other shall not in a criminal case be taken against the defendant. See for instance Rev. Sts. of Mo. 1909, § 5243; *State* v. *Weaver*, 165 Mo. 1; *State* v. *Taylor*, 57 W. Va. 228. See also Wigmore on Ev. § 488 (n).

One of these general principles is that, where the circumstances are strong against the defendant and it becomes a question what weight shall be given to them in view of any conceivable explanation of them, if there be witnesses who could furnish any such explanation and they are peculiarly under the influence of the defendant or peculiarly related in interest to him, then his failure to produce any such witness is a proper subject for comment unfavorable to him. *Commonwealth* v. *Webster*, 5 Cush, 295, 316. *Commonwealth* v. *Finnerty*, 148 Mass. 162. A failure to explain what can be reasonably explained may be taken as evidence that the truth would not help the defendant. The jury are to judge whether the defendant has done what he could to put the evidence before them and what weight should be given to his failure. There can be no doubt in the present case that the failure of the defendant to produce his wife is within the rule, unless it is excluded by the

fact that if called she might have refused to testify. *Common-wealth* v. *Galligan*, 156 Mass. 270.

The defendant always may relieve himself from any unfavorable inference by showing that by reason of the sickness or absence of the desired witness or from any other cause he has been unable to produce him; but he is to be held to reasonable effort to produce the witness, and in the absence of any evidence of such effort the rule applies. In the present case the wife was in court during the whole or a part of the trial, and ministered to the wants of the defendant. Apparently he had ample time to converse with her. Whether or not she, if called, would testify was a matter entirely personal to her. The privilege to refuse was hers, not his. If he had called her and she had refused to testify, then no inference could have been drawn against him. It then would have appeared that he had done all he could do to call her and avail himself of her evidence. But he did not call her. It does not appear that she refused to take the stand, or that the defendant had made any attempt whatever to get her testimony. This is not a case where the defendant has the right to introduce evidence under a law saying that the failure to produce it shall not be taken against him, as in the case of his own right to testify, but is a case where the witness is competent, and, if called, may testify or not as she pleases; and there is nothing to show her unwillingness. Her failure to testify is as consistent with the theory that he did not desire her to testify as with the theory that she was unwilling so to do. It cannot be assumed in his favor that her absence from the witness stand was due to her refusal to testify. If he desired to be relieved from the operation of the rule as to the production of his wife as a witness he should have shown that he had made an effort to that end. So far as respects our statute, the rule that the defendant should make reasonable effort to explain by the aid of witnesses peculiarly related to him is as applicable when the wife is the needed witness as where any other person is. *Commonwealth* v. *Galligan, ubi supra.*

The ruling requested could not have been given as a whole. It assumed the existence of something which had not appeared as a fact, namely, the choice of the wife to avail herself of the statutory privilege not to testify. The defendant, as heretofore has been said, made no further attempt to call the attention of the

presiding judge to the matter, either by an exception to the charge or by a request for some instructions as to the right of the wife to refuse to testify, but rested his case so far as this subject was concerned upon his exception to the refusal to give the ruling requested. There was no error in law in this refusal; and under the circumstances there is no ground for a new trial based upon the action of the court on this branch of the case.

The defendant has called our attention to some decisions in other States, and we have examined many others. Some of these decisions are based upon statutes differing in language from ours, and for that reason have but little, if any, bearing upon the construction to be given to our statute; but however that may be, even if there be anything in them inconsistent with the conclusion to which we have come, we cannot follow them.

10. The defendant excepted to so much of the charge as permitted the jury to take into account the presumption of sanity after evidence was introduced of the defendant's insanity. The rule on this subject is thus stated by Knowlton, C. J., in *Clifford* v. *Taylor*, 204 Mass. 358, 361 (which was a will case) in this language: "The true rule is that the presumption is enough to sustain the burden of proof, until evidence is introduced which tends to control it. On the introduction of such evidence, the case is to be determined upon the whole evidence, including the presumption of sanity, and if the preponderance of the evidence is in favor of sanity, the burden of proof is sustained and the jury will find for the executor. If, upon the whole evidence, including this presumption, the scales are in even balance, the finding will be for the contestant, on the ground that the executor has failed to sustain the burden of proof." The rule is the same in a criminal case except that the proof required is beyond a reasonable doubt. The presumption which is at first in one of the scales is not removed from its place merely because something is put in the other. It still remains where it was first placed, and to the end plays its proper part in helping to tip that scale down. The charge of the court on this branch of the case was in accordance with this principle, and was full, apt and correct.

*Exceptions overruled.*

*R. P. Stapleton,* for the defendant.

*C. T. Callahan,* District Attorney, for the Commonwealth.