COMMONWEALTH *vs.* JOHN D. MAILLET.

Hampshire.   April 6, 1987. — August 10, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, LYNCH, & O'CONNOR, JJ.

*Witness,* Privilege. *Statute,* Construction. *Homicide. Practice, Criminal,*
   Verdict, Judicial discretion. *Rules of Criminal Procedure.*

At a murder trial the judge correctly allowed the defendant's wife to assert
   her claim of privilege under G. L. c. 233, § 20, Second, to refuse to
   testify, even though she had been called as a witness for the defense.
   [575-578]
No abuse of discretion or error of law appeared in the trial judge's denial
   of a criminal defendant's motion under Mass. R. Crim. P. 25 (b) (2) to
   reduce the verdict of second degree murder to manslaughter. [579-581]

INDICTMENT found and returned in the Superior Court De-
partment on August 31, 1984.

The case was tried before *John F. Moriarty,* J.

The Supreme Judicial Court granted a request for direct
appellate review.

*Stephen R. Kaplan (William St. James* with him) for the
defendant.

*W. Michael Ryan,* District Attorney, for the Commonwealth.

LIACOS, J. The defendant was tried before a jury in Hamp-
shire County on an indictment charging murder in the first
degree. On April 24, 1985, he was convicted of murder in the
second degree. In this appeal, the defendant argues that (1)
by permitting his wife to refuse to testify in his behalf, the
judge erroneously allowed her claim of the spousal privilege,
G. L. c. 233, § 20, Second (1984 ed.);[1] and (2) the judge

---

[1] In the alternative, the defendant argues that, if the statute was applied
as intended, his wife's exercise of the marital privilege violated his right
"to have compulsory process for obtaining witnesses in his favor," which
is guaranteed by the Sixth Amendment to the United States Constitution,

erred in declining to enter a finding that the defendant was guilty only of manslaughter. See Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979). We allowed the defendant's petition for direct appellate review. We affirm.

The jury could have found the following facts. In the summer of 1984, the defendant was separated from his wife, Elizabeth Maillet (Elizabeth). They had lived together in Belchertown with her son by a previous marriage and a child of their marriage, John, Jr., then less than four years of age. The defendant worked as an attendant at the Belchertown State School; he held a second, part-time job at a gasoline filling station. His supervisor at the station was the victim, Susan Tyrell. In June, the defendant observed Tyrell in bed with Elizabeth and concluded that the two were having an affair. Thereafter, he indicated to three different people that he wanted Tyrell dead. He also issued an ultimatum to Elizabeth: to give up Tyrell, or to go away with her and leave the children with him. Elizabeth demanded in turn that the defendant leave the marital home. Ultimately, this result was accomplished pursuant to a Probate Court agreement, but not before the defendant had been assaulted by Elizabeth who became enraged when, on July 25, 1984, the defendant had served Tyrell with a notice of trespass at the marital home.

On August 15, 1984, with Elizabeth's consent, the defendant spent the morning caring for and entertaining the two children at places other than their home. At 1 P.M, the threesome arrived at the trailer park dwelling of the defendant's sister, Marsha Hutchinson (Marsha). He was upset, he said, because Tyrell had told the boys they would not be seeing him anymore. While drinking three cans of beer over the next two hours, he tried to reach Tyrell by telephone. Finally, at 3 P.M., he left the children with Marsha and went to his home to get bathing

and his right "to produce all proofs, that may be favorable to him," as provided by art. 12 of the Massachusetts Declaration of Rights. The defendant had every opportunity to raise these constitutional questions during trial, but he did not. Because these issues cannot be raised for the first time on appeal, *Commonwealth* v. *Cote,* 386 Mass. 354, 358-359 & n.6 (1982), and cases cited, we do not reach them. But see note 8, *infra.*

suits for the youngsters and to talk with Tyrell.[2] Tyrell told him that, if it were not for his son, he would not be bothering her and Elizabeth. The defendant countered that he cared for both children and would not abandon either of them. He then went into a bedroom to retrieve the bathing suits. When he returned to the living room, Tyrell stood before him holding a knife. The defendant did not "stop to think" of retreat, although the way was clear through either of two rear doors. Tyrell cursed him and told him his son was dead, that he would be dead. He felt fear, that she could have thrown the knife at him had he tried to retreat, and he thought both he and his son were dead; he pictured his son lying helplessly on the floor. He and Tyrell then wrestled for control of the knife. During the scuffle, they wound up on the floor; when Tyrell tried to sit up, "the knife got in her shoulder."[3]

In response to a telephoned summons from the defendant, Marsha arrived to find him wiping bloodstains from the living room rug. He told her that he "didn't mean to do it." He then drove away with Tyrell's body in the back seat of his automobile. Shortly after 4 P.M., the defendant rejoined Marsha at her trailer home, where he again said, "I did it, but I didn't want to do it." He told her he had disposed of the body at a site in Pelham where Marsha was having a house built. Meanwhile, Elizabeth had returned to her home. Tyrell was not there. Because she also found blood on the carpet, she called the Belchertown police to report that Tyrell was missing. At 6:23 P.M., the defendant, accompanied by his brother-in-law,

---

[2] From this point, the account of what happened to Tyrell is pieced together from the defendant's testimony at trial and from his statements to mental health experts and relatives who testified. His account at trial was less complete than those he gave to the expert witnesses; on the witness stand, he claimed that he had blacked out from the moment he first touched Tyrell until he awoke under interrogation at the Belchertown police station.

[3] According to medical testimony, Tyrell died quickly from loss of blood and asphyxiation due to a stab wound which extended into the trachea from an entry point in her back to the right of the spine near the seventh thoracic vertebra. She suffered a second stab wound from the front, which did not enter the chest cavity. No other knife wounds were found on her or the defendant.

Jerome Baron, surrendered himself at the Belchertown police station. Maillet was advised of his rights. In response to questioning, he acknowledged that he had gone to the house that afternoon. He said, "She [Tyrell] went after my son, and there ain't no way she's going to get away with that." He told the police where to find Tyrell's body.

Four mental health experts testified, two for the defendant and two for the Commonwealth. Testifying for the Commonwealth, Ronald S. Ebert, a forensic psychologist, agreed with one of the defendant's experts, Irving Kaufman, a psychiatrist, that the defendant suffered from a "borderline personality disorder" which could render him temporarily psychotic in response to the stress of a confrontation with Tyrell. Only Dr. Kaufman thought himself possessed of sufficient facts about what actually transpired between Tyrell and the defendant to conclude that he was not criminally responsible for Tyrell's death. The defendant's other witness, William P. Rohan, a clinical psychologist, diagnosed him as "prepsychotic" and incapable of handling emotion, but did not testify to a conclusion concerning the defendant's capacities at the time in question. The Commonwealth's other witness, William F. Bahnson, a psychiatrist, testified that the defendant suffered from an adjustment disorder with depression, but he was responsible on August 15, 1984, for his conduct.

In addition to his own testimony and that of his expert witnesses, the defendant called three other witnesses. One witness called by the defendant was his estranged wife, Elizabeth. On voir dire, she refused to give any testimony. The judge, relying on G. L. c. 233, § 20, Second, allowed her claim of privilege over the defendant's objection.

1. *The spousal privilege.* At one time, for reasons long discredited, it was the law of England and America that either spouse was disqualified from testifying in proceedings to which the other was a party. See generally 8 J. Wigmore, Evidence § 2227 (McNaughton rev. 1961). In 1870, the Massachusetts Legislature abolished the disqualification except where testimony concerning private interspousal conversation was sought; and in place of the absolute prohibition against tes-

timony where one spouse was a party, the Legislature vested a privilege in either spouse when called to testify in criminal proceedings against the other to testify or not at his or her choice.[4] See *Commonwealth* v. *Spencer,* 212 Mass. 438, 450-451 (1912).

It is clear, under Massachusetts law, and the defendant does not dispute that "[t]he privilege set up by the statute can be claimed by the witness-spouse only."[5] P.J. Liacos, Massachusetts Evidence 178 (5th ed. 1985 Supp.). However, the defendant does dispute what has also been agreed, that "the spouse facing criminal prosecution [has] no voice in controlling the witness stand appearance of the other," K.B. Hughes, Evidence § 142, at 125 (1961), even where the defendant-spouse is the party seeking testimony from the witness-spouse. See *Commonwealth* v. *Moore,* 162 Mass. 441, 443 (1894) (wife charged with perjury in her husband's defense "could have invoked the protection of the court, if she did not wish to testify" when called by husband's counsel); *Spencer, supra* at 451-452 (if defendant had called his wife to testify, she could have refused because "[t]he privilege to refuse was hers, not his"). The defendant contends that the statute, read correctly as punctuated when the Legislature first enacted it in 1870,[6] permits a witness-

---

[4] The statute in question, St. 1870, c. 393, § 1, is a progenitor to what is now G. L. c. 233, § 20. The predecessor statute read as follows: "No person of sufficient understanding shall be excluded from giving evidence as a witness in any proceeding, civil or criminal, in court or before a person having authority to receive evidence, except in the following cases: — *First.* Neither husband nor wife shall be allowed to testify as to private conversations with each other. — *Second.* Neither husband nor wife shall be compelled *to be a witness on any trial upon* an indictment, complaint or other criminal proceeding, against the other."

In relevant part, G.L. c. 233, § 20, Second, is not different except that, in place of the italicized words above, there now appear the words "to testify in the trial of" and, of central importance to this appeal, no comma now appears after the word "proceeding" to set off the clause "against the other."

[5] The Federal rule is now in accord with Massachusetts law. *Trammel* v. *United States,* 445 U.S. 40 (1980).

[6] When urging the judge to force his wife to testify, the defendant did not challenge the validity of the statutory punctuation as it now appears,

spouse to exercise the privilege only when called "to be a witness . . . against the other," not (as the judge permitted here) when called by a criminal defendant-spouse to testify *for* rather than *against* the other. In fine, it is the defendant's contention that the Legislature intended the words "against the other" to refer, not to the nature of the "proceeding" in which a spouse may decline to testify, but to the content of the spousal testimony.

As a matter of policy, the limitation of the privilege urged by the defendant does not lack adherents,[7] but his argument is textual and grammatical in nature. He now admits that the judge read the present text of G. L. c. 233, § 20, in a grammatically correct fashion. See note 6, *supra*. But, he argues, there was error nonetheless because the current text was improperly stripped of a crucial comma, originally positioned between the

---

sans comma, in G. L. c. 233, § 20, Second. Rather, he argued that the statute read grammatically meant that the privilege was available only when a spouse is called "to testify . . . against the other" spouse, i.e., in support of the prosecution rather than the defense. The judge disagreed with the defendant's grammatical assertions, however, deciding instead that the words "against the other" are properly read to refer to "the next prior language," i.e., the words "criminal proceeding," with the result that, in the judge's view, the defendant's wife was statutorily entitled to withhold her entire testimony, "pro or con," from the "criminal proceeding" at bar. For purposes of this appeal, the defendant concedes that the judge's reading of the statute as it now appears was grammatical; but he maintains that, if the statute now included the comma before "against the other" with which it was originally enacted, see St. 1870, c. 393, § 1, and note 4, *supra,* a grammatical reading would mandate the result for which he contends.

[7] Professor Hughes has observed that a rule which "permit[s] the whims of the witness-spouse to deprive both the defendant and the tribunal of otherwise competent and relevant information critical to the defense of the action, seems a high price to pay for 'marital harmony[,]'" particularly where, as here, "there is solid reason for belief that the marital harmony is past saving, [or] the witness-spouse . . . refuses to testify in behalf of the defendant spouse." Hughes, *supra* at 124. Professor Wigmore, who viewed the privilege generally as "an indefensible obstruction to truth in practice," 8 J. Wigmore, *supra* at § 2228, at 221, endorsed the position that, even if a spouse should be free to testify or not when called by the prosecution, "[t]here is no sufficient reason why, if a spouse not on trial is to be permitted to be a witness at all, such spouse should not be compelled to testify at the instance of the spouse on trial, as his or her witness . . . ." *State* v. *Todd,* 173 La. 23, 29 (1931). 8 J. Wigmore, *supra* at § 2241, at 255-256 n.3.

word "proceeding" and the words "against the other," see note 4, *supra,* by a commission established in 1896 to consolidate the Public Statutes of 1882 into what became the Revised Laws of 1902. Compare St. 1870, c. 393, § 1 (with comma), and Pub. Sts. (1882) c. 169, § 18 (with comma), with R. L. (1902) c. 175, § 20 (sans comma).

To begin, we think the defendant's grammatical arguments are doubtful at best. Some "[c]ourts have indicated that punctuation will not be given much consideration in interpretation because it often represents the stylistic preferences of the printer or proofreader instead of the considered judgment of the drafter or legislator." 1A C. Sands, Sutherland Statutory Construction § 21.15, at 135 (4th ed. 1985). But the crux of the matter is reached when we reflect that deletion of the comma by the commission merely brought the revised law into grammatical conformity (even under the defendant's view of grammar) with what was then the prevailing judicial interpretation of Pub. Sts. (1882) c. 169, § 18, cl. 2, the immediate successor statute to St. 1870, c. 393, § 1 — that a spouse was privileged to testify or not, even when called by the defendant-spouse. See *Commonwealth* v. *Moore,* 162 Mass. 441, 443 (1894). The revision of the statute in 1902, sans comma, was grammatically consistent with the import of *Moore*. We note that the court has consistently interpreted the statute in accordance with *Moore,* with or without the allegedly significant comma. See, e.g., *Moore, supra; Commonwealth* v. *Baker,* 185 Mass. 324, 325 (1904); *Commonwealth* v. *Spencer,* 212 Mass. 438, 451-452 (1912). Additionally, the Legislature recently reenacted the comma-less version of the statute by St. 1983, c. 145, with presumed knowledge of the policy questions raised by critics of the rule, see note 7, *supra.* Thus, we conclude that the judge's application of § 20 was consistent with the intent of the Legislature.[8] Consequently, there was no error.

---

[8] We have not reached the constitutional questions raised by this defendant. See note 1, *supra.* However, we recognize that in cases of this kind constitutional rights of defendants may be implicated. See *Washington* v. *Texas,* 388 U.S. 14, 19 (1967) (Sixth Amendment to the United States Constitution, as applied to States through the Fourteenth Amendment, may override

2. *Motion for relief under Mass R. Crim. P. 25 (b) (2)*. The defendant also argues that the judge erred by denying his motion for postverdict relief.[9] Motions under rule 25 (b) (2), 378 Mass. 896 (1979), are addressed to the sound discretion of the trial judge. *Commonwealth* v. *Cinelli,* 389 Mass. 197, 204, cert. denied, 464 U.S. 860 (1983). "In deciding whether to reduce a jury verdict to a finding of guilty of a lesser offense, a trial judge, acting under rule 25 (b) (2), should be guided by the same considerations that have guided this court in the exercise of its powers and duties under [G. L. c. 278,] § 33E, to reduce a verdict. This court has used that power sparingly. Our function has not been to second-guess the jury." (Footnote omitted.) *Commonwealth* v. *Gaulden,* 383 Mass. 543, 555 (1981). On appeal by the Commonwealth we have stated, "In our review of a judge's order under rule 25 (b) (2) . . . we should not engage in an independent analysis of the question. . . . [W]e consider only whether the judge abused his discretion or committed an error of law. . . . Rule 25 (b) (2) places the matter in the hands of the judge who heard the witnesses, and we

State-created evidentiary privileges in favor of defendants' rights to establish defenses). Without intimating, one way or the other, whether a defendant in these circumstances would be entitled to spousal testimony pursuant to art. 12 of the Declaration of Rights without a credible showing, as may be required pursuant to the "compulsory process" clause of the Sixth Amendment or the "due process" clause of the Fifth and Fourteenth Amendments, that the spouse would offer evidence "material and favorable to his defense," *United States* v. *Valenzuela-Bernal,* 458 U.S. 858, 873 (1982), we note that the defendant in this case made no offer of proof whatsoever.

[9] The Commonwealth observes that, while this court may have jurisdiction pursuant to its constitutional or statutory supervisory authority to hear defendants' appeals from denials of their motions to reduce a verdict under rule 25 (b) (2), see art. 29 of the Massachusetts Declaration of Rights; G. L. c. 211, § 3 (1984 ed.), we have not acted heretofore to reduce a conviction to the level of a lesser included offense except under G. L. c. 278, § 33E (1984 ed.), see *Commonwealth* v. *Gaulden,* 383 Mass. 543, 555 n.9 (1981), a statute which no longer requires us to review convictions of murder in the second degree. Compare St. 1962, c. 453 (requiring review where defendant indicted for murder in the first degree is convicted of murder in either first or second degree), with St. 1979, c. 346, § 2 (not requiring review where, as here, defendant so indicted is convicted of murder in second degree).

should not undertake to substitute our judgment for his." (Footnote omitted, citations omitted.) *Id.* at 557. Assuming the defendant to have an equal right of appeal from a denial of a motion under rule 25 (b) (2), we apply the same standard of review.[10]

The defendant argues that the judge should have substituted a verdict of guilty of manslaughter because the evidence, properly weighed, "indicates that [he] broke when he was faced with the imminent rupture of his family, and that he acted . . . in circumstances of great stress" at a time when, according to all the experts who testified, "he was mentally ill." We are not unmoved; the defendant appears to have led a difficult life during which he may have given far more than he received. However, the defendant does not contend that the evidence of sanity was insufficient to support a verdict of guilty. See *Commonwealth* v. *McHoul,* 352 Mass. 544 (1967).

His request that the verdict be reduced to manslaughter is more in the nature of an argument that, if the evidence here was regarded correctly by the jury as lacking that quality of "cool reflection" essential to any finding of premeditation, *Commonwealth* v. *Blaikie,* 375 Mass. 601, 605 (1978), the same evidence should also be viewed, in light of his testimony that Tyrell acted as the aggressor on terrain which was recently his home, as demonstrating "that he was confused and frightened rather than enraged." *Commonwealth* v. *Kinney,* 361 Mass. 709, 713 (1972) (reducing verdict of second degree murder to manslaughter pursuant to § 33E). The only evidence of Tyrell's aggression came from the defendant himself. Against this, the jury had to weigh the testimony of witnesses who recounted the defendant's threats to kill Tyrell as well as the medical testimony which tended to contradict his version

---

[10] We have utilized this standard of review in cases where both parties appealed from the ruling of a judge on a motion to reduce a verdict pursuant to rule 25 (b) (2). See *Commonwealth* v. *Millyan,* 399 Mass. 171, 188-190 (1987); *Commonwealth* v. *Cobb,* 399 Mass. 191, 192 (1987). In both cases we assumed the defendant's right of appeal and applied the same standard to the appeals of both parties. Thus, we reject the urging of the defendant to substitute our independent judgment for that of the judge.

of the events. The jury's verdict was warranted by the evidence before them. See *Commonwealth* v. *Schnopps*, 390 Mass. 722, 726-727 (1984). Based on his hearing of the same testimony heard by the jury, the judge chose not to disturb their verdict; relying solely on the cold record before us, we would be unwise if we chose to do differently.

*Judgment affirmed.*