COMMONWEALTH *vs.* RICHARD DOHERTY.

Norfolk.  November 5, 1986. — February 11, 1987.

Present: WILKINS, LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Constitutional Law,* Assistance of counsel.

In the circumstances of a rape trial in which the Commonwealth's case was
very strong, the failure of defense counsel to object to the admission in
evidence of testimony by a Commonwealth witness, a Roman Catholic
priest, did not deny the defendant the effective assistance of counsel
guaranteed him by the Federal and State Constitutions even if it be
assumed that the priest's testimony fell within the ambit of the privilege
provided in G. L. c. 233, § 20A, where his testimony was of doubtful
impact and was, in part, supportive of the defendant's case, and where
the defendant did not demonstrate that its exclusion "would have ac-
complished something material for the defense." [198-200]

INDICTMENTS found and returned in the Superior Court De-
partment on August 6, 1984.

The cases were tried before *John F. Murphy, Jr.,* J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Steven J. Rappaport* for the defendant.

*Judith A. Cowin,* Assistant District Attorney, for the Com-
monwealth.

O'CONNOR, J. A jury found the defendant guilty on two
charges of rape. The judge sentenced the defendant to succes-
sive terms of six to twelve years at the Massachusetts Correc-
tional Institution, Cedar Junction, but suspended the second
term. The defendant appealed, and through new counsel now
contends that he was denied his Federal and State constitutional
rights to effective assistance of trial counsel by the failure of
his counsel to object to the admission in evidence of a Roman
Catholic priest's testimony which, the defendant claims, falls
within the ambit of the privilege provided in G. L. c. 233,

§ 20A (1984 ed.). That statute provides in pertinent part that no "priest, rabbi or ordained or licensed minister of any church or an accredited Christian Science practitioner shall testify as to any communication made to him by any person in seeking religious or spiritual advice or comfort . . . without the consent of such person." We transferred the appeal to this court on our own motion. Because the impact of the challenged testimony is doubtful, and the Commonwealth's case was strong in any event, we conclude that the defendant has not established the prejudice required for a successful claim of ineffective assistance of counsel, and we affirm the convictions without reaching the issue whether the statements made by the defendant to the priest fall within the scope of the privilege.

The Commonwealth's principal witness was the alleged victim, Barbara Doherty (Barbara). She testified substantially as follows. Barbara and the defendant were married for thirteen years. In November, 1983, they ceased living together and Barbara began divorce proceedings which culminated in the entry of a judgment of divorce nisi on October 4, 1984. When Barbara told the defendant of her intention to obtain a divorce, he choked her and threw her across the room. He threw things at her and threatened to kill her.

According to Barbara's testimony, she arrived at her home on July 13, 1984, at 11:30 A.M., after having completed her regular twelve hour shift at her place of employment. While she was preparing to go to sleep, she heard the defendant calling her from outside the house, and she yelled to him to leave her alone. All the doors and windows were locked. She placed telephone calls to her mother and Gwenn DeVasto, a counselor at the Family Service Unit in Quincy. Barbara testified that she went to sleep and, when she awoke, the defendant was standing over her. She cried hysterically and begged the defendant to leave her alone, but he forced her to have sexual intercourse with him. She feared for her life because the defendant previously had threatened to kill her and had beaten her many times. Barbara asked the defendant how he could rape her, and he responded that it could not have been rape because they were still married. He told her that he had gained access

to the house through a rotted bulkhead. As soon as the defendant left the house, Barbara called her friend, Christine Hayden, and told her that the defendant had just raped her. She also called the counselor, DeVasto, and arranged to meet her. At the Family Service Unit, she told DeVasto the defendant had raped her.

According to Barbara's testimony, the defendant raped her again on July 21, 1984. After she arrived home from work that morning, she encountered the defendant hiding behind a wall in her house. She attempted to scream, but the defendant grabbed her mouth and arm and forced her to go upstairs where he forced her to engage in sexual intercourse twice within a period of two and one half hours. Barbara had secured the house, but the defendant told her he had entered through a dining room window at 4 A.M. Throughout the episode, the defendant attempted to persuade Barbara to drop the divorce action. He forced her wedding ring back on her finger and insisted that they were married and that rape was not possible. Also, he threatened to kill both of them, and she feared for her life. As soon as the defendant left, Barbara telephoned Hayden and asked Hayden to come to Barbara's home. When Hayden arrived, Barbara recounted her ordeal, and Hayden called the police. Barbara was taken to the hospital and examined. On cross examination, Barbara testified that on July 21 the defendant had not struck her. She also testified that he made no specific threats, "but he did threaten to kill" her.

DeVasto and Hayden testified. Their testimony substantially corroborated Barbara's testimony about her prompt complaints to them. They testified to the details Barbara had given them. The details were similar to those to which Barbara had testified. They described Barbara as trembling or crying when they saw her.

A police officer and a police detective testified that they went to Barbara's home on July 21, 1984, that there were no signs of forced entry into the house, and that they found Barbara crying uncontrollably. The detective testified that on the way to the hospital Barbara told him that the defendant had raped her twice in the same episode and had raped her the week

before. Other fresh complaint evidence was given by a nurse who testified that she saw Barbara at the hospital on July 21. Still another witness, Barbara's mother, testified that on July 19, 1984, the defendant came to her house, that she called him a rapist, and that he responded by saying he was sorry for what he had done to Barbara.

The only other noteworthy evidence is the challenged testimony of the Commonwealth's witness, Reverend Joseph Raeke. The defendant did not testify.

We quote Raeke's testimony, admitted without objection, in material part:

"Q On . . . July 22nd, 1984, did you have a conversation with the defendant in this case, Richard Doherty?
A I did.
    . . .
Q Could you describe the conversation?
A Richard called me, seeking advice because he knew that the police were looking for him and he wanted to know what to do in terms of, should he turn himself in or not. So I told him — well, I wanted to find out what he was talking about, and he told me. Then I suggested that he turn himself in.
Q What did he tell you?
A He told me that he had gone over to Barbara's and that they had made love.
    . . .
Q Did you then have further conversation with him about the incidents that had occurred?
A You know, I asked him, you know, 'What actually happened?' I got confused when I was talking to him because he was referring actually to two different events.
Q Did he say something in regard to the first event or what did you say and what did he say about that?
A Well, prior to all this, the last time I talked to Richard he said he was never going to have anything to do with Barbara. So then I asked him, you know, 'Well, why all of a sudden were you over there after you told me you weren't going

to see her, and that you were not going to have anything to do with her?'

He said, well, he thought that one last time of being with her, maybe he could convince her that they could work things out.

Q Did he say anything about how he had gotten into the house that time?

A Yes. He said that he had gone through the bulkhead.

Q And then did he say anything further to you?

A Well, I said to him, you know, 'What went on? Did Barbara allow you to have sex? I mean, was she willing?' He says, 'Well, you know, she didn't want to initially, but she gave in.'

Q Did you say anything else to him?

A I said, 'Well, did she really want to have sex?' He said, 'Well, we made an agreement if we did have sex, then I would leave.'

Q Did you say anything else to him?

A Well, I said that, 'If she was not willing to do this, it sounds like you forced yourself on her, and to me it sounds like rape.'

Q What did he say to that?

A That 'It couldn't be rape because we're married.'

Q Did he say anything in regard to her screaming?

A He said that she had, you know — she was upset that he was there, but then after he agreed to leave after they had sex, she seemed to quiet down.

Q Did you ask him if she had fought or if she had put up any resistance?

A Yes.

Q What did he say?

A 'She didn't fight too much.'

. . .

Q Did you ask him if she had screamed at all?

A Yes.

Q What did he say to that?

A That she did scream initially, but then she quieted down."

On the day after Raeke testified, defense counsel moved for a mistrial, citing G. L. c. 233, § 20A. He asserted that Raeke should not have been permitted to testify. Counsel attributed "99 per cent of the blame" to himself, stating that his failure to object to the testimony was due to his failure to focus on the pertinent part of the statute. The judge denied the motion for a mistrial, and defense counsel then moved to strike the testimony. The judge also denied that motion. This appeal followed.

The defendant's sole contention is that he was denied the effective assistance of counsel, guaranteed by the Federal and State Constitutions, by trial counsel's failure to object to Raeke's testimony. The Massachusetts ineffective assistance of counsel test, set forth in *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974), is "whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." If the Massachusetts test for ineffective assistance of counsel is met, the Federal test is met also, *Commonwealth* v. *Fuller,* 394 Mass. 251, 256 n.3 (1985), so we apply the *Saferian* test. Under that test, unless the defendant's defense has been prejudiced by counsel's conduct, it is unnecessary for us to consider whether the unobjected to evidence was admissible, or counsel was incompetent, inefficient, or inattentive. *Commonwealth* v. *Sellon,* 380 Mass. 220, 223 (1980). *Commonwealth* v. *Satterfield,* 373 Mass. 109, 115 (1977). In this case, we conclude that no prejudice has been shown. Hence, we go no further than briefly to explain the basis of our conclusion.

The defendant properly acknowledges in his brief that his "chances of obtaining a favorable jury verdict were not glowing," but, he says, until Raeke testified, they were not hopeless either. The defendant "was relying on a consent defense." Indeed, no other avenue of escape appears to have been possible for him. The defendant contends that the Commonwealth's case rested primarily on Barbara's testimony, and that his de-

fense was advanced by her testimony, and that of the other Commonwealth witnesses, on cross-examination. He points to the testimony that there were no signs of forced entry into the victim's house, that on July 21, 1984, the defendant did not strike Barbara, and that he did not specifically threaten her. He also contends that there was evidence from which the jury could have found that on July 13, 1984, the victim invited him into the house because she wanted to receive an automobile insurance check from him. "Once the priest testified," the argument goes, "the defendant was effectively precluded from testifying in a case in which he was raising a consent defense. For had the defendant taken the stand, and had he been cross-examined with regard to his alleged admissions, any denial on his part would have been tantamount to his labelling of his parish priest as a liar. This would not have sat well with the jury."

Our view of the situation differs from that of the defendant. In our view, the Commonwealth's case was very strong. Barbara and the defendant undeniably had been separated at the time of the occurrences. That circumstance, together with Barbara's detailed testimony, fortified by the testimony of numerous fresh complaint witnesses, made it unlikely that the jury would fail to find that the Commonwealth had sustained its burden of proof. There was no inconsistency between Barbara's testimony and the evidence brought out on cross-examination. Furthermore, Barbara's testimony about there having been no specific threats on July 21, was, in full context, that there were no such threats except that the defendant threatened to kill her. Also, contrary to the defendant's contention, there was no evidence to justify a finding that Barbara consented to the defendant's entry into her home on July 13 to deliver an insurance check.

Portions of Raeke's testimony can reasonably be seen as supporting the Commonwealth's case. Other portions, however, tended to show not rape, but consensual lovemaking in the course of a reconciliation effort, which, it could be argued, occurred voluntarily; lovemaking after an agreement that the defendant subsequently would leave the house. Raeke's testi-

mony was the only evidence in the case that even suggested consent, and it was presented to the jury without the defendant's being subject to cross-examination. The defendant has not demonstrated that, had Raeke not testified, the defendant would have been in a better position to present an effective consent defense. It cannot fairly be said that, if counsel had objected to the evidence, and it had been excluded, counsel would have "accomplished something material for the defense." *Commonwealth* v. *Satterfield, supra* at 115. We are not satisfied, therefore, that the defendant did not have effective assistance of counsel at trial.

*Judgments affirmed.*