COMMONWEALTH *vs.* THOMAS ROSA, JR.

Suffolk. December 5, 1991. - March 9, 1992.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & GREANEY, JJ.

*Evidence*, Hearsay, Prior inconsistent statement, Impeachment of credibility. *Practice, Criminal*, Argument by prosecutor, Instructions to jury. *Witness*, Privilege.

At a murder trial the prosecutor in his closing argument improperly urged the jury to use testimony, admitted for the limited purpose of impeachment, as substantive evidence to cast doubt on the defendant's alibi and to support an eyewitness identification; where the judge's instructions did not cure the error and where the case against the defendant could not be characterized as overwhelming, a new trial was required. [156-160]

At the retrial of a murder case the judge was to consider whether a witness's decision to waive her spousal privilege and to testify at her husband's trial was voluntary, in order to determine if any of the witness's relevant prior recorded testimony should be admitted at the retrial. [160-163]

INDICTMENTS found and returned in the Superior Court Department on February 11, 1986.

The cases were tried before *Sandra L. Hamlin*, J.

*Brownlow M. Speer*, Committee for Public Counsel Services (*Gordon A. Oppenheim*, Committee for Public Counsel Services, with him), for the defendant.

*Mark D. Zanini*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Convicted of murder in the first degree, kidnapping, and aggravated rape, the defendant, Thomas Rosa, Jr., appeals. On appeal, he alleges that the prosecutor's summation was improper. Rosa asserts that the prosecutor made substantive use of testimony admitted solely to impeach the credibility of the defendant's wife. The defendant concludes

that the prosecutor's summation requires reversal. We agree. We comment briefly on some issues likely to recur at a retrial.

1. *Procedural background.* Rosa was first tried on these charges in late September and early October of 1986 in Superior Court for Suffolk County. At trial, one of the Commonwealth's witnesses was the defendant's wife, Olga Gomez (Gomez). She waived her spousal privilege not to testify at her husband's trial. The jury was unable to reach a verdict, and a mistrial was declared.

The defendant was tried a second time in November, 1986. At this trial, the Commonwealth again called Gomez to testify. She asserted her spousal privilege and declined to testify. The prosecutor sought, and was allowed by the judge, to introduce the transcript of Gomez's testimony at the first trial. A police detective then testified to a prior conversation with Gomez, in which, according to the detective, Gomez made statements inconsistent with her testimony.

2. *Facts.* A. *The crime.* The body of Gwendolyn Taylor, a nurse's aide, was found on the morning of Saturday, December 7, 1985, in a car in the parking lot of an automobile body shop on Norfolk Street in the Dorchester section of Boston. Taylor had been strangled with a sweater, and she was nude.

Police suspicion focused on Rosa as a result of reports by witnesses who saw the victim moments before her disappearance in the early morning hours of December 7, 1985. Taylor was expected home shortly after midnight at the apartment she shared with her boyfriend and two others. She had been accompanied to a corner close to the apartment by her boyfriend, who was spending that night at his aunt's nearby. Shortly thereafter, four witnesses saw Taylor in the company of a man, later identified by two witnesses as the defendant.[1]

---

[1] On the morning of December 7, 1985, Taylor's roommate, Charita Offley, picked the defendant's photograph from an array and stated with certainty that he was the man she saw with Taylor. She also made a "positive" in-court identification. A neighbor, Sharon Areh, who lived in a first-floor apartment in the same building as Offley and the victim and witnessed many of the events in question, also made photographic and in-

Witnesses saw the two walking in the area near Taylor's apartment building. At one point, the two entered the vestibule of the apartment building. Witnesses variously recounted that Taylor's wrist was "locked" with the defendant's and that the defendant had his arm around Taylor.

As Taylor and the defendant moved about in the street below, Taylor's roommate, Charita Offley, watched from the apartment's window. Also watching from the window were Offley's sister, Donita, and Donita's boyfriend, Kevin Neil. At one point, Taylor, who seemed "scared" and "hysterical," saw the three in the window and asked them to give her $100. When they replied that they did not have the money, Taylor complained that she could not believe that they were "doing this to [her]." Offley recounted that, when she saw the victim and the defendant in the vestibule of the apartment building, the defendant held "a shiny object to [Taylor's] shoulder."

Neil went to his car to pursue Taylor and the defendant. However, he lost sight of them when they disappeared down an alley. This was the last time Taylor was seen alive. Police were called to the scene. Despite a lengthy search, they were unable to locate the victim. Taylor's body was found at about 9:40 A.M.

Chemical analysis of body fluids found in and on the victim were consistent with the defendant's blood type. Similarly, chemical analysis of stains on the defendant's jacket, seized later and identified by both Offley sisters as the one worn by the defendant on the night in question, revealed skin cells consistent with the victim's blood type.

B. *The investigation.* After Offley and her downstairs neighbor, Sharon Areh, had selected Rosa's photograph from an array, police detective Sergeant Charles Horsley met with the defendant and brought him to the police station. Fully. apprised of his Miranda rights, Rosa made a statement. He told Horsley that he had been at home from about 11 P.M. on

---

court identifications of the defendant. On appeal, the defendant does not challenge the identifications.

Friday, December 6, until 10 A.M. on Monday, December 9. Rosa also told Horsley that, on the night in question, he had worn the same clothes he then had on, including a grey, full-length men's overcoat and grey, pinstriped pants. Horsley then placed the defendant under arrest.

That afternoon, Horsley went to an apartment on Colonial Avenue in Dorchester, where he spoke with Olga Gomez, the defendant's wife. According to Horsley's testimony, Gomez at that time told him that the defendant had been in and out of the apartment on the night of December 6 and 7. Horsley testified, however, that Gomez told him that Rosa left the apartment at 11:30 P.M. and returned sometime "[b]efore daybreak." Horsley apparently was also prepared to testify that Gomez told him that Rosa was her boyfriend.

Horsley obtained a search warrant for the Colonial Avenue apartment. When he returned to execute the warrant, he seized a jacket and a pair of blue jeans. Both Offley sisters later identified the jacket as the one they saw the defendant wearing on the evening in question, and it also matched Areh's description of the jacket. Donita Offley also told police that the defendant wore blue jeans that night.

3. *The first trial testimony: Olga Gomez.* Before December, 1985, when the case was scheduled for a probable cause hearing in District Court, and again before September, 1986, when the case was first tried in Superior Court, the police attempted to summons Gomez to court. These repeated attempts were unsuccessful, and, on September 29, 1986, the first judge issued a capias (arrest warrant) for Gomez. Pursuant to the warrant, Horsley and Detective Thomas Trailer established a stakeout at the home of the defendant's mother, where the detectives suspected Gomez was staying.

On October 1, 1986, at about 10 A.M., the two detectives saw Gomez leaving the residence in a taxi cab. With her were Gomez's cousin, Ms. Morales, Gomez's three year old son, Jonathan, and her one month old son, Emanuel. Gomez was on her way to the Dana Farber Institute, where both of her sons had medical appointments. Three year old Jonathan had recently had an operation for brain cancer and required

constant care. At the time, Jonathan was being fed through a tube inserted directly into his stomach. The tube required regular cleaning to prevent blockage.

The detectives stopped the taxi and Horsley informed Gomez that they had a warrant to bring her to court. Gomez explained the situation, and the police went with her to the hospital. Horsley explained to Gomez that, if she did not arrive at the courthouse by 4 P.M., there would be a bail hearing. According to Gomez, he also told her that she might be held at the courthouse overnight. The party arrived at the hospital at around 10:30 A.M. Horsley spoke with the children's doctor, and the doctor also spoke by telephone to the assistant district attorney handling the case. The doctor explained the seriousness of Jonathan's condition. At that time, arrangements were made for Jonathan to be admitted to the hospital in the event that Gomez was held overnight.[2] Both the police and the district attorney's office were aware of these arrangements.

Gomez left the hospital with the detectives at about 2:30 P.M. Accompanying Gomez were her son, Jonathan, and a pediatric social worker, Joanne Shanahan. Ms. Morales took Gomez's son Emanuel home with her. The party arrived at the Suffolk Superior courthouse at about 3 P.M. Gomez was taken to an office. Her husband's trial was underway in a courtroom nearby. Gomez waited in one room, while her son and Shanahan waited in another. Gomez spoke briefly with Horsley and at some length with Richard Sinnott, an investigator for the district attorney's office. In the course of the conversation, Sinnott read to Gomez the text of Detective Horsley's report of their conversation of December 9, 1985, in Gomez's apartment. After reading Gomez the report, Sinnott asked her whether she wanted to testify. According to Sinnott, Gomez said that she did. Sinnott had not explained the spousal privilege to Gomez.

---

[2]Richard Sinnott, an investigator for the district attorney's office testified on voir dire that he "probably" told the attending physician over the telephone that Gomez might be held overnight.

Gomez was called into the courtroom at about 3:50 P.M. By that time, Gomez's son Jonathan had been admitted by telephone to the hospital and had left the courthouse for the hospital in the care of Shanahan. After Gomez was sworn, defense counsel requested a voir dire to determine whether she wanted to invoke the spousal privilege. A voir dire was held. The assistant district attorney asked Gomez, "[A]re you going to testify in this case?" After some hesitation,[3] Gomez answered, "Yes."

The court allowed defense counsel leave to cross-examine Gomez. Over the prosecutor's objection, defense counsel was permitted briefly to explain the spousal privilege to Gomez.[4] Defense counsel then asked Gomez whether she would testify. Gomez first explained that she did not "want to" testify and, then, when pressed by the court, declared that she would not.[5] At this point, the prosecutor announced his in-

---

[3]The relevant portion of the transcript reads:

| | |
|---|---|
| THE PROSECUTOR: | "And, Olga Gomez, are you going to testify in this case?" |
| THE WITNESS: | (No response) |
| THE JUDGE: | "Did you hear the question?" |
| THE WITNESS: | "Yes." |
| THE JUDGE: | "We're waiting for your answer." |
| THE WITNESS: | "Yes." |
| DEFENSE COUNSEL: | "May the record indicate that the witness put her head down for twenty seconds; is crying at the present time. . . ." |

[4]According to both her own testimony and defense counsel's representations to the court in the course of the second trial, Gomez had discussed the spousal privilege with her husband's defense counsel prior to the first trial.

[5]The transcript of the voir dire recounts the following exchange during the cross-examination of Gomez.

| | |
|---|---|
| DEFENSE COUNSEL: | "Do you know that all you have to say is, 'I don't want to testify' and you can leave the court room." |
| THE JUDGE: | "You, Miss Gomez, you've indicated, when [the prosecutor] asked you: Were you willing to testify in this case. And you said you were. Right?" |
| THE WITNESS: | "Mm-hmm." |

tention to introduce evidence that Gomez was not married to the defendant.[6]

The prosecutor explained that he intended to present testimony that Gomez, "by her own admissions," was not married to Rosa. The prosecutor further indicated that Gomez's claim of the spousal privilege was "going to involve her incriminating herself in a welfare fraud." The record reflects that the Commonwealth had evidence that, prior to the first trial, Gomez had represented to welfare officials that she was not married. The prosecutor therefore asked the court to appoint counsel for Gomez. The court did not do so.

The judge determined that consideration of the matter should be delayed until the next day when counsel could be appointed for Gomez. The prosecutor then asked the court to order Gomez held in custody overnight pursuant to the capias. The judge agreed. Defense counsel then raised the issue of bail. The judge ignored defense counsel, saying: "I'm holding her on the capias until tomorrow morning." Defense counsel twice asked to be heard, and the judge twice refused. Court officers took Gomez to a cell, where she remained for a few minutes. The judge then asked a court officer to bring

---

| THE JUDGE: | "Now, let me ask you. First, let me say this to you, that you have a privilege that you can exercise here. If you, in fact, are married to Mr. [Rosa] and you are his wife, you have a privilege not to testify against him; but you can waive that privilege. You can give that privilege up, as you seem[ed] to indicate when [the prosecutor] asked you: Will you testify in this case." |
| | "Are you going to testify in this case?" |
| THE WITNESS: | "I don't want to." |
| THE JUDGE: | "You may not want to, but are you going to?" |
| THE WITNESS: | "No." |
| THE JUDGE: | "You're not going to?" |
| THE WITNESS: | "No." |
| THE JUDGE: | "All right." |

[6]It is undisputed that, at this time, the prosecution had been presented by defense counsel with a marriage license evidencing that Thomas Rosa, Jr., and Olga Gomez were married on May 26, 1984.

the jury back into the courtroom so that they could be excused for the evening.

Defense counsel then alerted the court that the defendant did not want his wife held overnight. Defense counsel further represented that the defendant wanted his wife to testify, a proposal to which defense counsel noted his strong objection. The judge reiterated his desire to postpone the matter until the next day. Defense counsel replied, "[N]o. [The defendant] doesn't want [Gomez] held. She has a child." The judge pointed out that, in his understanding, Gomez's son Jonathan was "taken care of . . . for the evening." Defense counsel rejoined that the defendant nonetheless did not want his wife held and would prefer that she testify than be held overnight.

The court ordered Gomez brought back to the courtroom to discuss the matter with her husband. Defense counsel, not for the first time, noted his objection to the proceedings. Gomez and Rosa conferred, and Gomez then took the stand. The judge asked Gomez whether she was "willing" to testify in this case, to which she replied, "Yes." The judge then said: "And you understand, as I explained to you earlier, you have a privilege not to testify. But you wish to waive that privilege and testify, is that what you are saying to this court?" Again, "[Y]es" was Gomez's reply. The judge called for the jury. The judge then questioned Gomez about her ability to speak English. Gomez replied that she could "speak good." The judge then asked Gomez: "[Y]ou speak all right and you understand?" Gomez replied: "[A] little bit." The judge concluded: "[A]ll right. Well, let's see what happens."

Gomez took the stand. Her testimony was often confused, and, in places, self-contradictory. In answer to many questions, Gomez testified to a lack of memory. In an attempt to refresh her memory, the prosecution showed Gomez Detective Horsley's report of their December 9, 1985, conversation. With the aid of an interpreter, Gomez read the report. She did not remember telling Horsley, as Horsley later testified she did, that her husband had left the apartment at

11:30 P.M. on December 6, 1985. She also did not remember
telling Horsley that her husband returned home "sometime
before daybreak" on December 7, 1985, as Horsley testified
she did. Gomez testified, instead, that Rosa left their apart-
ment at 11 P.M. on the night in question but that "he came
back right away." She testified that, on the night in question,
the defendant was wearing a "grey jacket, coat and jeans."[7]
Gomez admitted having shown Horsley a beige jacket, but
denied telling him that it was the one her husband had worn
on the night in question, as Horsley later testified. Finally, on
cross-examination, Gomez testified that on December 9,
1985, Horsley had asked her yes-or-no questions, some of
which she did not understand.[8] The first trial ended in a
mistrial.

4. *The second trial.* At the second trial before a different
judge, the Commonwealth called Gomez to the stand. She
asserted her marital privilege not to testify against her hus-
band. The judge ruled that the marriage was valid and that
Gomez "voluntarily claimed the privilege." Gomez thus did
not testify at the second trial. The Commonwealth then
sought to introduce the transcript record of Gomez's testi-
mony at the first trial as prior recorded testimony. Defense
counsel objected, arguing that Gomez's waiver of the spousal
privilege at the first trial had not been voluntary. A further
voir dire was held, after which the judge ruled that Gomez's
prior recorded testimony could be read to the jury as sub-
stantive evidence. After this testimony was admitted, the
judge permitted Detective Horsley to recount his conversa-
tion with Gomez on December 9, 1985. According to Hors-
ley, Gomez at that time made statements inconsistent with
her recorded testimony. The judge limited the use of Hors-
ley's testimony to impeaching Gomez's prior recorded testi-
mony. Defense counsel objected to the introduction of Hors-

---

[7]Rosa told the police that, on the night in question, he had been wearing
a grey topcoat and grey pants.

[8]Horsley later testified that Gomez had no difficulty speaking English
and that he had no difficulty understanding her.

ley's impeachment testimony and moved to strike both it and Gomez's testimony from the record. Defense counsel argued that there was a substantial danger that the jury would consider Horsley's testimony "as substantive evidence." The judge denied the motion.

5. *The prosecutor's closing argument.* When the Commonwealth, pursuant to G. L. c. 233, § 23 (1990 ed.), introduces evidence of prior inconsistent statements of its own witness, the evidence is admissible only to impeach the credibility of the witness; it has no substantive value as evidence of the defendant's guilt. *Commonwealth v. Thompson,* 362 Mass. 382, 385-386 (1972), citing, inter alia, *Commonwealth v. Turner,* 224 Mass. 229, 237 (1916). Such statements are "inadmissible hearsay when offered to establish the truth of the matters asserted." *Commonwealth v. Daye,* 393 Mass. 55, 66 (1984), citing *Commonwealth v. Bookman,* 386 Mass. 657, 665 (1982). *Commonwealth v. Thompson, supra* at 386. *Salonen v. Paananen,* 320 Mass. 568, 575 (1947). See P.J. Liacos, Massachusetts Evidence 141 (5th ed. 1981).

A prosecutor may not present to the jury evidence admitted for a limited purpose as if it were substantive evidence. See *Commonwealth v. Bassett,* 21 Mass. App. Ct. 713, 716 (1986) (closing argument "improper" where prosecutor used prior criminal convictions to establish defendant's propensity for violence); *Commonwealth.v. Felton,* 16 Mass. App. Ct. 63, 66 (1983) (same). Cf. *Commonwealth v. McDuffie,* 16 Mass. App. Ct. 1016, 1018 (1983) (prosecutor's closing argument wrongly invited jury to consider rape incident report as substantive evidence rather than mere corroboration). "In analyzing a [defendant's] claim of improper argument, the prosecutor's remarks must be viewed in light of the 'entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.' " *Commonwealth v. Lamrini,* 392 Mass. 427, 432 (1984), quoting *Commonwealth v. Bourgeois,* 391 Mass. 869, 885 (1984). *Commonwealth v. Pontes,* 402 Mass. 311, 316 (1988).

We conclude that, in this case, the prosecutor[9] ignored the limited purpose for which Horsley's testimony was admitted to impeach the credibility of Gomez. Because the prosecutor repeatedly juxtaposed Gomez's reported statements to Horsley against the defendant's statements to the police, the jury were invited to use Horsley's testimony as evidence of the defendant's consciousness of guilt. Moreover, the prosecutor himself used Gomez's statements, as recounted on the stand by Horsley, to show that the defendant had the opportunity to commit the crime.

In his closing argument, the prosecutor made extensive use of Horsley's testimony about his conversation with Olga Gomez in her home on December 9, 1985. In responding to defense counsel's closing argument in which defense counsel contended that the case turned on identification, the assistant district attorney asserted that the case was also one "of time opportunity because we know that although Thomas Rosa told the police he was home from eleven o'clock that Friday night [December 6, 1985] and never left until the following Monday morning, we know that his wife told Sergeant Horsley something different, that he came home around eleven [P.M. on Friday, December 6] and left at about twelve-thirty [A.M. on Saturday, December 7] and didn't come back until daybreak." "So," the prosecutor concluded for the jury, "you've got the geographical opportunity all within three-tenths of a mile with each other and you've got the missing [period] of time, from twelve-thirty [A.M.] to daybreak, both geography and time, the opportunity which supports the identification."

In this portion of his summation, the prosecutor improperly used Horsley's account of Gomez's statement to him for two substantive purposes. First, he invoked Horsley's account of Gomez's statement to cast doubt on the defendant's proffered alibi. Second, he used it to support the eyewitness identification of Rosa as the man last seen with Taylor. Each of these is a substantive purpose unrelated to impeachment of

---

[9]Appellate counsel was not trial counsel.

Gomez, and each is therefore impermissible. See *Daye, supra* at 66, and cases cited.

Later in his argument, the prosecutor returned to Horsley's testimony about his conversation with Gomez. The prosecutor noted that, when he was arrested, the defendant claimed to have been at home during the entire period of the incident.[10] The prosecutor proceeded to use a number of the details of Gomez's statement, as testified to by Horsley, to cast doubt on the defendant's alibi.[11] The prosecutor's use of Horsley's account of Gomez's statement to rebut the defendant's allegedly false alibi is clearly an impermissible substantive use of Horsley's testimony. The prosecutor's closing argument urged the jury to consider, as substantive evidence, Horsley's testimony admitted for the limited purpose of impeaching Gomez's prior recorded testimony. "We cannot say that the evidence and the prosecutor's [use of it in his] argument did not have the effect the Commonwealth intended it to have." *Commonwealth* v. *Reed*, 397 Mass. 440, 443 (1986).

---

[10]As he did not testify, the defendant did not repeat this claim at trial.

[11]The prosecutor said: "Sergeant Horsley goes and talk[s] to Olga Gomes, the wife. . . . And she says he came home from the track at about eleven, eleven-thirty, stayed for about an hour, an hour and a half, which puts it to twelve, twelve-thirty, left and didn't come back until daybreak. Does that fit, ladies and gentlemen, with the timeframe? We've got him at the 130 Talbot hallway at about one o'clock. *She's got him leaving his house . . . at twelve-thirty.* It fits. It clicks. He lives one-tenth of a mile from where [Taylor lived]. The one tenth of a mile is right where [Taylor's boyfriend] walked her home. So at twelve-thirty, even though he's telling the police that he was home from eleven o'clock on, *the wife tells Sergeant Horsley he left at twelve-thirty.* Doesn't the time frame work perfectly, putting it at [Taylor's home] at one o'clock? And again, after they walked down that alleyway and after he's taking her to her grave in that cemetery, *doesn't it it fit that the wife is telling Sergeant Horsley he didn't get back until daybreak?* That's when he raped her and killed her. But he wants the police to believe he never left that apartment that night, was there until the following Monday morning. *But his wife told the police that, in fact, he went out and didn't come back until daybreak.* And they said to Olga Gomez, 'What was he wearing?' *Olga Gomez is the one, ladies and gentlemen, his wife is the one that told Sergeant Horsley where the brown jacket was and that's the one he was wearing . . .*" (emphasis added).

The Commonwealth maintains that the prosecutor only discussed Horsley's testimony near the end of his argument, in the course of attacking the defendant's alibi as corroborated by his wife's statement. This argument fails to persuade for three reasons. First, in responding to defense counsel's assertion that the case turned on identification testimony, the prosecutor explained that the case was also one "of time opportunity." His only support for this position was Horsley's report of Gomez's statement. Second, in attacking the alibi, the prosecutor did not contrast Gomez's prior statement to Horsley against her recorded testimony. Instead, as the Commonwealth itself notes, the prosecutor juxtaposed Gomez's prior statement to Horsley against the defendant's statement to the police. Third, as we read the record, the bulk of the prosecutor's substantive use of the impeachment occurred at the climax of his argument. Rather than minimizing the prejudice, as the Commonwealth contends, the record appears to show that the substantive impact of the improper argument was heightened by its dramatic position in the peroration.

At the conclusion of the prosecutor's summation, defense counsel timely objected.[12] Defense counsel requested a curative instruction, and the judge gave such an instruction.[13] Also in the charge, the judge repeated the instruction, first given before closing arguments, that closing arguments are not evidence. The instructions made no reference to the content of either closing argument.

The Commonwealth argues that the judge's careful instructions on the limited use of prior inconsistent statements cured any prejudice resulting from the prosecutor's improper

---

[12]Having requested a curative instruction at the end of the prosecutor's closing argument, defense counsel did not waive the right to appeal by failing to object during the course of the argument. *Commonwealth v. Haas*, 373 Mass. 545, 559 (1977), and cases cited.

[13]Before allowing Horsley to testify about Gomez's prior statement, the judge properly instructed the jury as to the limited use of prior inconsistent statements. The judge repeated the instruction once during Horsley's testimony. Finally, as requested by defense counsel, the judge included a thorough instruction in the charge to the jury.

argument. This contention is unpersuasive. By giving thorough limiting instructions, the judge did her best to ensure that the jury understood the limited purpose of impeachment testimony. Generally, "[w]e presume, as we must, that a jury understands and follows limiting instructions." *Commonwealth* v. *Jackson*, 384 Mass. 572, 579 (1981), citing *Commonwealth* v. *Leno*, 374 Mass. 716, 719 (1978). *Commonwealth* v. *Helfant*, 398 Mass. 214, 228 (1986). The substantive emphasis that the prosecutor placed on Horsley's testimony, however, especially in light of its apparent importance to the Commonwealth's case, weakens this presumption. "[We cannot] conclude that the instructions of the judge, which limited the statement to impeachment purposes, sufficiently protected the defendants from such a highly prejudicial statement." *Commonwealth* v. *Ferrara*, 368 Mass. 182, 194 (1975).

The Commonwealth asserts that, even if the judge's instruction did not cure the error, there was no prejudice to the defendant because the evidence against him was overwhelming. We cannot so conclude in this case. The first trial ended in a mistrial, as the jury was unable to reach a verdict. Thus, to a jury, the case against the defendant was not overwhelming. We therefore cannot "say 'with fair assurance,' that the jury did not attach substantial significance to evidence" that the defendant's whereabouts were unaccounted for during the critical period. *Commonwealth* v. *Reed*, 397 Mass. 440, 443 (1986), quoting *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983). See *Kotteakos* v. *United States*, 328 U.S. 750 (1946). A new trial is required.

6. *Issues likely to recur at a retrial.* The defendant asks that we rule that Gomez's prior recorded testimony not be admitted in the event that she does not testify at a new trial. The Commonwealth is correct in arguing that, generally, a "defendant has no standing to contest an alleged infringement of the privilege as it applies to testimony of his spouse." P.J. Liacos, Massachusetts Evidence 178 (5th ed. 1985 Supp.). *Commonwealth* v. *Szczuka*, 391 Mass. 666, 677 (1984). *Commonwealth* v. *Paszko*, 391 Mass. 164, 190

(1984). *Commonwealth* v. *Stokes*, 374 Mass. 583, 595 (1978). This is because "[t]he privilege is that of the spouse called and not of the defendant." *Commonwealth* v. *Spencer*, 212 Mass. 438, 451 (1912). A "defendant has no standing to contest an alleged infringement of a privilege he could not have exercised." *Paszko, supra* at 190. That principle, however, does not end our inquiry.[14]

Gomez's treatment at the first trial raises a serious question of fairness. Gomez was at the courthouse by 3 P.M. and was called to testify before 4 P.M., but no lawyer was appointed to represent her, and there was no hearing to set bail.[15] Even after the prosecutor alerted the judge that Gomez's invocation of the privilege might incriminate her in a welfare fraud case and urged the judge to appoint counsel for her, the judge did not do so. Although there was ample time to attend to these matters, Gomez was ordered held overnight without representation, without a hearing, and without any consideration of bail.[16] See section 3, *supra* at 153.

These facts raise the question whether Gomez's decision to waive the spousal privilege and testify at her husband's first trial was voluntary. If her decision was not voluntary, then Gomez's prior recorded testimony should not be admitted at the retrial.[17] Therefore, prior to the retrial, the judge should determine whether Gomez voluntarily chose to waive her

---

[14]A defendant, of course, may object on evidentiary grounds. See *infra*.

[15]Moments before announcing that he was "holding [Gomez] on the capias until" the next day, the judge explained that "[t]he best thing . . . to do is to put it over until tomorrow morning, get counsel appointed, and . . . have a full hearing on this matter."

[16]If, after hearing, the judge had concluded that Gomez was a material witness, he could have held her by following the procedures set out in G. L. c. 276, §§ 45-51 (1990 ed.). Among other things, the statute would have required the judge to appoint counsel, hold a hearing, and then order "such surety as the court deems necessary for [the witness's] appearance." G. L. c. 276, § 47 (1990 ed.). The judge took none of these steps.

[17]Although the judge at the second trial allowed the prosecutor to read Gomez's prior recorded testimony to the jury, she did not specifically find that Gomez's waiver of the privilege at the first trial was voluntary.

spousal privilege and testify at her husband's first trial. If, after hearing, the judge determines that Gomez's decision to testify was involuntary, then the use of her testimony offends fundamental fairness. Cf. *LaFrance* v. *Bohlinger*, 499 F.2d 29 (1st Cir.), cert. denied sub nom. *LaFrance* v. *Meachum* and *Meachum* v. *LaFrance*, 419 U.S. 1080 (1974) (due process forbids use of defense witness's coerced statement to police to impeach defense witness). *Vargas* v. *Brown*, 512 F. Supp. 271 (D.R.I. 1981) (same).

If after hearing, however, the judge concludes that Gomez's waiver of the spousal privilege at the first trial was voluntary, portions of her testimony may be admitted substantively at the retrial. We have reviewed Gomez's prior recorded testimony to assess its relevance.[18] Most of her testimony at her husband's first trial was confused and self-contradictory. She repeatedly testified to failures of memory, and attempts to refresh her memory were unsuccessful. However, in her prior recorded testimony, Gomez said that her husband was wearing blue jeans on the night of the crime. Gomez also testified that, in response to Horsley's request to see the jacket her husband wore that night, she produced a tan jacket later identified as the one worn by the victim's abductor. Gomez also modified that statement by explaining that she had told Horsley "maybe [Rosa] was wearing that jacket." She testified that she "took that coat [out of the closet], but [Rosa] didn't wear it because it was too big for him."[19]

---

[18]At trial, the defendant objected to the admission of his wife's prior recorded testimony on the ground of relevance, and we consider the admissibility of the prior recorded testimony on that basis.

[19]Gomez testified that, on the night of the crime, the defendant left their apartment twice. Her testimony as to the time at which he left and returned is so confused as to be virtually incomprehensible. To the extent that any probative evidence emerged from her testimony, Gomez appears to say that her husband first left the apartment at 7 P.M. to go to the dog racing track. He returned sometime around 10 P.M. According to Gomez, her husband left the apartment shortly thereafter and returned "around eleven, eleven thirty."

Apart from these two items, there is nothing in Gomez's prior recorded testimony that properly aids the prosecution. A fair reading of Gomez's testimony reveals that most of it is either too confused to be understood or contrary to the prosecutor's theory of the case.[20] At a retrial, the primary reason for introducing most of Gomez's confusing (and, in places, exculpatory) testimony would be to provide a foundation for admission of Horsley's impeachment testimony. The Commonwealth, of course, may not introduce Gomez's prior recorded testimony solely for the purpose of impeaching it. See *Commonwealth* v. *Benoit*, 32 Mass. App. Ct. 111, 114-117 (1992).

We therefore conclude that the only portions of Gomez's prior recorded testimony that may be offered as substantive evidence are her statements about her husband's blue jeans and tan jacket, including her explanation with regard to the jacket. All other portions of Gomez's prior recorded testimony are excluded. The admission of Horsley's testimony to impeach Gomez's prior recorded testimony similarly is limited to questions relating to the blue jeans and tan jacket.[21]

The judgments are reversed and the verdicts set aside. The case is remanded to the Superior Court for both a determination of the voluntariness of Gomez's waiver of the spousal privilege and a new trial.[22]

*So ordered.*

---

[20]For example, on the question of time opportunity, Gomez's prior recorded testimony places the defendant in his apartment at 11:30 P.M. (or immediately thereafter) on the night of the crime. See note 11, *supra*.

[21]If Gomez testifies at the retrial, the prosecution may of course impeach her. Similarly, should the defendant introduce portions of the prior recorded testimony, the Commonwealth may impeach those portions.

[22]The evidentiary rulings complained of were within the discretion of the judge. While not artfully phrased, the question put to the expert was well within his knowledge and required no special expertise. Next, the cross-examination of the lone defense witness did not implicate either the defendant's failure to call witnesses or his failure to testify. The character witness could be asked whether he had any information about the defendant's whereabouts at the time of the crime.