COMMONWEALTH *vs.* RUSSELL P. SYLVIA.

No. 92-P-1557.

Barnstable. June 8, 1993. - September 16, 1993.

Present: PERRETTA, KAPLAN, & GILLERMAN, JJ.

*Assault and Battery. Witness*, Competency, Credibility, Privilege. *Evidence*, Conversation between husband and wife. *Practice, Criminal*, Assistance of counsel.

At the trial of a criminal case, the judge correctly ruled that a witness was competent to testify. [311-312]

At the trial of two indictments for assault and battery, the evidence presented was sufficient for submission of the cases to the jury. [312-315]

At the trial of two indictments for assault and battery, the defendant's wife's testimony of a conversation with the defendant was properly admitted where the defendant did not make a timely objection to the evidence. [315-316]

At a criminal trial, alleged ineffective assistance of counsel in failing to object to certain testimony did not provide a basis for the grant of a new trial, where, even if that evidence had been excluded, it was unlikely that the verdict would have been different. [316]

On appeal from a criminal conviction, the defendant husband had no standing to contest an alleged infringement of the wife's privilege under G. L. c. 233, § 20, Second, not to testify against him. [316-317]

INDICTMENT found and returned in the Superior Court Department on January 6, 1992.

The case was tried before *James J. Nixon, Jr.*, J.

*Kenneth I. Seiger* for the defendant.

*Julia A. Vermynck*, Assistant District Attorney for the Commonwealth.

KAPLAN, J. In this case of domestic violence, the husband, Russell Sylvia, upon jury trial in Superior Court in Barnstable County, was found guilty of two counts of assault and battery (G. L. c. 265, § 13A) upon his wife, Leta Roderick-Sylvia, committed on the respective dates October 6 and Oc-

tober 14, 1991.[1] On his appeal to this court from the convictions, the defendant argues that the judge erred (1) in deciding, in his discretion, that the wife, who testified for the prosecution, was competent to testify; (2) in holding that the evidence presented at trial was sufficient to support the convictions; (3) in admitting in evidence the contents of a conversation between the husband and his wife; and (4) in failing to declare a mistrial when the wife indicated (if in fact she did) that she was recanting her waiver of her marital privilege not to testify against her husband.

1. *The wife's competency as a witness.* After the jury were impanelled, the judge conducted a voir dire on this matter, with the prosecutor taking the wife on direct examination, the defendant's counsel on cross. This proceeding took place on March 18, 1992, five months after the events in suit. The wife was described as physically frail. Evidently she had suffered a nervous breakdown; she was in treatment for pneumonia at Falmouth Hospital, to which she had returned after a short period at a place called "Gosnold" in Falmouth for alcohol and drug detoxification. At the hospital she was being medicated with antibiotics and with Librium, Haldol, and Atavan.

From the wife's testimony it appeared that she knew she was in court before a judge. She was told, and appeared to be aware, that she was not required and could decline to testify; she was willing to testify in the hope that she might help the defendant to avoid harsh punishment. She knew she was under oath and intended to tell the truth.

Regarding the charges, she testified to a first occasion on which the defendant struck her with his fists and with a space heater, and a second on which he kicked her. She said she told the police about each episode. She recounted the injuries she suffered. What clouded or detracted from the

---

[1] The jury found the defendant not guilty of two counts of assault and battery with a dangerous weapon (G. L. c. 265, § 15A) — a space heater on October 6, a shod foot on October 14. The jury also acquitted the defendant on a count charging him with assault and battery on November 12, 1991.

strength of the testimony was her admitted condition of severe intoxication at the time of the beatings. She referred repeatedly to blackouts in those days and lapses in present memory and wavered in her testimony. Defendant's counsel probed the weaknesses.[2]

The defense did not object to the judge's ruling of competency, and it is futile as well as untimely for the defense to complain of the ruling on appeal. The ruling was correct, for the judge could well find that the witness had more than the minimal cognitive capacity and understanding of the duty to tell the truth as described in the cases. See *Commonwealth* v. *Brusgulis*, 398 Mass. 325, 329 (1986), and cases cited. Although the witness was competent, her credibility was of course to be assessed by the jury.

2. *Sufficiency of the evidence.* Called for the prosecution, the wife testified, as she had at voir dire, to being under treatment at Falmouth Hospital. On the occasions in suit, she was living with the defendant in a basement room of a rooming house at 93 Pleasant Street, Hyannis. On the first occasion (fixed as October 6), after an argument of indefinite origin, the defendant, heaving an electric space heater that left marks on the wall, beat her so that she suffered a black eye, contusions, three broken ribs, and a concussion. She recalled lying on a stretcher, intermittently losing consciousness. She thought she spoke to the police. She was taken to Falmouth Hospital.

She thought the second beating occurred a day and a half after the first (other proof fixed it on October 14). She was asleep. The defendant came into the room with a companion, awakened her, and kicked her in the side with a sneakered foot. (The companion struck the defendant, evidently in reproof.) Police came. She made an in-court identification of Officer Mark Frenzo as one of them. She refused hospital care this time. Four months pregnant, she lost the baby as the result (so she presumed) of the defendant's abuse.

---

[2]In describing the voir dire, as in dealing with the trial, we necessarily omit various details.

The witness's testimony was sprinkled with confessions of uncertainty about details — e.g., who started the October 6 argument, whether she hit the defendant as he was hitting her — and admissions of blackouts around the time of the beatings.

Cross-examination emphasized the wife's daily massive consumption of vodka and her general dependence on alcohol and drugs in this period. Her mental haze at the time resulted in deficits or confusions of memory on which counsel could dilate in his questioning.

Officer Paul MacDonald of the Barnstable police, next witness for the Commonwealth, testified that, responding to a radio call at 7:50 P.M., October 6, he drove to the Pleasant Street address. There he found four or five emergency medical technicians caring for the wife, who lay on a stretcher, evidently at the top of the stairs leading from the basement. She was crying, shaking, and having trouble breathing. Her left eye was swollen nearly shut, with discoloration extending across her forehead and over the other eye. Blood was running from her nose and was on her mouth and hands, and on her shirt, sweatshirt, and pants. The wife told MacDonald the defendant had beaten her with fists, feet, and a portable electric heater.[3]

MacDonald went to the basement room. It was in shambles. There was a pool of blood on the floor near the bed. The defendant was present, attempting to tidy up. MacDonald saw a patch of blood on his pants. He had no apparent injury. MacDonald looked, rather superficially, for an electric heater, but he could not find it. He arrested the defendant, who evidently was released the next day.

Officer Mark Frenzo, also of the Barnstable police, was called to 93 Pleasant Street on October 14. Upon arrival he saw the wife approaching him in the hallway. She was favor-

[3]Under G. L. c. 233, § 23, the prosecutor introduced this statement to the police to impeach the wife's testimony that she was lacking in memory of the events in question. The prosecutor was scrupulous to say in his closing speech that the statement went to the wife's credibility, and the judge so charged. See *Commonwealth* v. *Rosa*, 412 Mass. 147, 156 (1992). There is no dispute about this matter on the present appeal.

ing her right side and appeared to be in pain. Her left eye was swollen black and blue. She said she had been asleep; the defendant came in and said, "I'm not going to let you go." She said she threatened to call the police. The defendant began punching and kicking her on the right side. She left and called the police.

Officer Frenzo said the wife refused to go to the hospital. He went down to the basement room. The defendant was in bed watching television. Arrest followed.

The defendant testified in his own behalf. On October 6 he stopped his work as a line cook at "Steamers" in Hyannis about 12:30 P.M. and returned home to 93 Pleasant Street. His wife was drinking and taking Klonopin pills (a heroin substitute). They argued. He left the house to see about finding another place to live. Returning, he said, about 3:30 P.M., he saw his wife in bed; they had another argument; she resumed sleeping. A few hours later she got up, put on her shoes, called him a name, and, walking out, staggered into the TV and VCR; the video cassettes atop the VCR fell to the floor. She left the room. He lay on the bed, watching a football game. There was no physical encounter. He did not see her again that day. He was picking the cassettes off the floor when Officer MacDonald appeared.

On October 14 (Columbus Day) he worked a full day to 6:00 P.M. He brought food back home for his wife. He woke her and she ate and drank vodka. He busied himself videotaping a movie from the television. They were both in bed. His wife must have left. When Officer Frenzo appeared between 11:30 P.M. and midnight, the defendant was still in bed. He saw his wife in the corridor as he was led out after being arrested.

At no point, said the defendant, did his wife appear injured.

Pressed on cross-examination, the defendant said the spot of blood on his pants on October 6 must have come from his job, and he denied there was a pool of blood in the room. Now he seemed to say he had not passed his wife as he went out after arrest: she had already left. Now, it appeared, she

was not unscathed: on the 7th, though not on the 6th, she was "a mess." The whole drift of the defendant's testimony, denying any violence on his part, collided with the testimony of the wife and the police.

It is apparent from our narrative that the judge did not err in holding that the Commonwealth's evidence — the testimony of the wife combined with that of the police officers — made a case to be answered, a case for the jury, within the doctrine of the *Latimore* case (*Commonwealth* v. *Latimore*, 378 Mass. 671, 677 [1979]), and, in the sense of the doctrine, that case did not "deteriorate" by reason of the defendant's testimony. The defense, indeed, did not move explicitly for a required finding of not guilty either at the close of the Commonwealth's case or at the close of all the evidence; it now suggests that its argument about the evidence when the Commonwealth rested may serve in lieu of a motion. That proposition is very doubtful, see Mass.R.Crim.P. 25(a), 378 Mass. 896 (1979); Smith, Criminal Practice and Procedure § 1906 (2d ed. 1983 & Supp. 1993), and it need not detain us.[4]

3. *The husband-wife conversation.* The wife testified on direct examination that on the day before trial she received a telephone call from the defendant. With some wavering, she indicated that the defendant had encouraged her to testify so as to attribute her wounds to her falling down the stairs while drunk. Defense counsel offered no objection to this testimony (which figured also at voir dire), and indeed he cross-examined the wife about it, but he did object when the prosecution began to cross-examine the defendant on the point (objection overruled). Counsel was trying to invoke G. L. c. 233, § 20, First, which (with exceptions) disqualifies a spouse from testifying to the content of a private conversation with the other spouse. See *Gallagher* v. *Goldstein*, 402 Mass. 457, 459 (1988); Liacos, Massachusetts Evidence 179-182 (5th ed. 1981 & Supp. 1985). The objection came too late. Such evidence, if received in the absence of proper ob-

---

[4]There is nothing in our points 3 and 4 below to affect our conclusion that there was a case for the jury when the Commonwealth rested.

jection, "is admitted for its full probative value." *Commonwealth* v. *Azar*, 32 Mass. App. Ct. 290, 304 (1992), citing *MacDonald's Case*, 277 Mass. 418, 422 (1931), *Commonwealth* v. *Stokes*, 374 Mass. 583, 595 n.8 (1978), and *Bak* v. *Bak*, 24 Mass. App. Ct. 608, 611 n.3 (1987).

The defense is thus brought to the point of arguing that defense counsel, by failing to move to bar the evidence, rendered ineffective assistance to his client, and that the verdict should be set aside on that account. It appears possible that defense counsel chose at first the tactic of not objecting in order, on cross-examination of the wife and with the aid of the defendant's testimony, to create a variant picture: that of an accused who wanted the plain and unheated truth to be told, and who was duly repentant besides (the wife said, "He promised [in the conversation] it would never happen again"). The objection finally came, perhaps, as an anchor to windward. Assuming, however, that counsel's handling of the matter was mistaken, and below the level of competence to be expected of the average lawyer, see *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974), we think the defense makes no progress, for we consider it most unlikely that, had the evidence never reached the jury, the verdict would have been different. Cf. *Commonwealth* v. *Doherty*, 399 Mass. 193, 200 (1987) (involving unobjected to admission of parish priest's privileged testimony).

4. *Marital privilege not to testify.* In elaboration of what was said at our point 1, we should say that the judge at voir dire took pains to make sure that the wife was knowingly waiving her privilege to refrain from testifying against her husband (G. L. c. 233, § 20, Second). At the close of voir dire, the judge found that she had waived the privilege. (The judge chose not to follow a defense suggestion that he appoint a lawyer to advise her further about the privilege.) It is not disputed on this appeal that the waiver was voluntary. The defense rather points to an episode at trial. Under redirect examination, the wife, becoming restive and exhibiting, perhaps, a residual protectiveness toward the defendant, answered, "I plead the Fifth on that" to the prosecutor's ques-

tion (not a fresh one), "Tell us now what he [the defendant] did to you and what he said to you." The judge remarked that the Fifth Amendment to the United States Constitution did not protect the witness from answering the prosecutor's question, but he added, "[I]t might be considered a recantation of some form . . . ." The point was not pursued, but the defense now argues that the witness's words should be read as an attempt to renounce her waiver of the marital privilege, with the drastic result, according to the defense, that the wife's testimony should have been struck or a mistrial declared; and counsel's failure to move for such relief is characterized as ineffective assistance.

The short answer for purposes of this appeal is that the defendant husband is not the owner of the wife's marital privilege not to testify against him, and he has no standing to contest an alleged infringement of the wife's privilege. See *Commonwealth* v. *Rosa*, 412 Mass. 147, 161 (1992).[5] See also *Commonwealth* v. *Maillet*, 400 Mass. 572, 576 (1987).

*Judgments affirmed.*

---

[5]*Rosa*, above cited, was an exceptional case in which a criminal defendant was permitted to challenge his wife's waiver of the marital privilege where there was a question whether her waiver was voluntary. *Id.* at 161-162. If the wife's decision to testify at the defendant's first trial on charges of rape, murder, and kidnapping was not voluntary, then introduction of her evidence at the second trial on the same charges would, in the court's view, "offend[] fundamental fairness." *Id.* at 162. As noted, there is no claim on this appeal that the wife's waiver was anything other than voluntary.